**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN OVERSIGHT, | |
| *Plaintiff*, | |
| v. | |
| U.S. DEPARTMENT OF HEATLH AND HUMAN SERVICES, | Case No. 17-cv-01448 (ABJ) |
| and | |
| OFFICE OF MANAGEMENT AND BUDGET | |
| *Defendants*. | |

**<u>MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**PAGE**

INTRODUCTION ...................................................................................................................1

BACKGROUND .................................................................................................................2

ARGUMENT ...................................................................................................................4

I.      FOIA and Summary Judgment Standards of Review ........................................4

II.     The Agencies Conducted Adequate Searches for Responsive Records ............................5

III.    The Agencies' Decision to Treat Distinct Emails as Separate Records Was
        Consistent with American Oversight's FOIA Request and Permissible
        Under FOIA .............................................................................................9

IV.     The Agencies Properly Withheld and Redacted Records Under FOIA
        Exemption 5 ...........................................................................................13

        A.      OMB Properly Withheld in Full a Draft Letter to the President
                Requested and Reviewed by the President's Senior Advisors..............................16

                1.      *The Draft Letter Is Subject to the Deliberative Process Privilege* ............16

                2.      *The Draft Letter Is Subject to the Presidential Communications
                        Privilege* ...............................................................................17

                3.      *Showing the Draft Letter to Members of Congress Did Not Waive
                        Either Privilege* .........................................................................18

        B.      The Agencies Properly Redacted Emails Sent to Congress Pursuant to
                the Deliberative Process Privilege ......................................................21

                1.      *The Redacted Emails Qualify as "Intra-Agency" Communications
                        for Purposes of Exemption 5*............................................................21

                2.      *The Material Redacted from the Emails Is Both "Predecisional"
                        And "Deliberative."*.....................................................................27

        C.      The Agencies Processed and Released All Reasonably Segregable
                Information ...........................................................................27

CONCLUSION....................................................................................................28

## TABLE OF AUTHORITIES

**CASES**                                                                                          **PAGE(S)**

*Am. Immigration Lawyers Ass'n v. Exec. Office of Immigration Review,*
   830 F.3d 667 (D.C. Cir. 2016) ................................................................................. 10, 11, 12

*August v. FBI,*
   328 F.3d 697 (D.C. Cir. 2003) ................................................................................. 4

*Baker & Hostetler LLP v. Dep't of Commerce,*
   473 F.3d 312 (D.C. Cir. 2006) ................................................................................. 6

*Brayton v. Office of U.S. Trade* Representative,
   641 F.3d 521 (D.C. Cir. 2011) ................................................................................. 5

*CNA Fin. Corp. v. Donovan,*
   830 F.2d 1132 (D.C. Cir. 1987) ............................................................................... 21

*Coastal States Gas Corp. v. DOE,*
   617 F.2d 854 (D.C. Cir. 1980) ................................................................................. 14, 16, 27

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy,*
   161 F. Supp. 3d 120 (D.D.C.), *as modified,* 185 F. Supp. 3d 26 (D.D.C. 2016) ..................... 17

*CREW v. NARA,*
   583 F. Supp. 2d 146 (D.D.C. 2008) ......................................................................... 17

*Ctr. for Effective Gov't v. Dep't of* State,
   7 F. Supp. 3d 16 (D.D.C. 2013) ............................................................................... 16, 28

*DOI v. Klamath Water Users Protective Ass'n,*
   532 U.S. 1 (2001) ..................................................................................................... 14, 23, 24, 25

*Dow Jones & Co, Inc. v.DOJ,*
   917 F.2d 571 (D.C. Cir. 1990) ................................................................................. 2, 21, 22, 25

*Formaldehyde Inst. v. HHS,*
   889 F.2d 1118 (D.C. Cir. 1989) ............................................................................... 15, 21, 23

*Gilliam v. DOJ,*
   128 F. Supp. 3d 134 (D.D.C. 2015) ......................................................................... 5

*Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
   762 F. Supp. 2d 123 (D.D.C. 2011) ......................................................................... 15

*Heggestad v. DOJ,*
    182 F. Supp. 2d 1 (D.D.C. 2000) ........................................................... 19

*John Doe Agency v. John Doe Corp.,*
    493 U.S. 146 (1989) ............................................................................... 4

*Juarez v. DOJ,*
    518 F.3d 54 (D.C. Cir. 2008) ................................................................. 27

*Judicial Watch v. Export-Import Bank,*
    108 F. Supp. 2d 19 (D.D.C. 2000) ......................................................... 14

*Judicial Watch, Inc. v. DOD,*
    715 F.3d 937 (D.C. Cir. 2013) ................................................................. 5

*Judicial Watch, Inc. v. DOE,*
    412 F.3d 125 (D.C. Cir. 2005) ................................................... 17, 23, 24

*Judicial Watch,* Inc. v. DOJ,
    365 F.3d 1108 (D.C. Cir. 2004) ....................................................... 15, 18

*Judicial Watch, Inc. v. U.S. Dep't of Transp.,*
    950 F. Supp. 2d 213 (D.D.C. 2013) ....................................................... 24

*Light v. DOJ,*
    968 F. Supp. 2d 11 (D.D.C. 2013) ........................................................... 5

*Loving v. DOD,*
    550 F.3d 32 (D.C. Cir. 2008) .................................................... 14, 15, 18

*McKinley v. Bd. of Governors of Fed. Reserve Sys.,*
    647 F.3d 331 (D.C. Cir. 2011) ............................................................... 24

*Military Audit Project v. Casey,*
    656 F.2d 724 (D.C. Cir. 1981) ................................................................. 5

*Murphy v. Department of Army,*
    613 F.2d 1151 (D.C. Cir. 1979) ....................................................... 19, 20

*Nat'l Inst. of Military Justice [NIMJ] v. DOD,*
    512 F.3d 677 (D.C. Cir. 2008) .................................................... 21, 23, 24

*Nat'l Sec. Archive Fund, Inc. v. CIA,*
    402 F. Supp. 2d 211 (D.D.C. 2005) ....................................................... 27

*Nat'l Sec. Archive v. CIA*,
    752 F.3d 460 (D.C. Cir. 2014) ............................................................... 26

*NLRB v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................... 13, 17, 26

*Oglesby v. Dep't of Army*,
    920 F.2d 57 (D.C. Cir. 1990) ............................................................... 5, 7, 9

*Parker v. DOJ, Office of Prof'l Responsibility*,
    278 F. Supp. 3d 446 (D.D.C. 2017) ............................................................... 10

*Pfeiffer v. CIA*,
    721 F. Supp. 337 (D.D.C. 1989) ............................................................... 15

*Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech. Policy*,
    881 F. Supp. 2d 8 (D.D.C. 2012) ............................................................... 27

*Public Citizen, Inc. v. DOJ*,
    111 F.3d 168 (D.C. Cir. 1997) ............................................................... 23

*Rockwell Int'l Corp. v. DOJ*,
    235 F.3d 598 (D.C. Cir. 2001) ............................................................... 19, 20, 22

*Russell v. Dep't of Air Force*,
    682 F.2d 1045 (D.C. Cir. 1982) ............................................................... 14

*Ryan v. DOJ*,
    617 F.2d 781 (D.C. Cir. 1980) ............................................................... 21, 22, 23

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991) ............................................................... 6

*In re Sealed Case*,
    121 F.3d 729 (D.C. Cir. 1997) ............................................................... 14, 16, 17, 18

*Shapiro v. CIA*,
    247 F. Supp. 3d 53 (D.D.C. 2017) ............................................................... *passim*

*Students Against Genocide v. Dep't of State*,
    257 F.3d 828 (D.C. Cir. 2001) ............................................................... 20

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ............................................................... 27

*U.S. DOJ v. Julian*,
   486 U.S. 1 (1988) ............................................................................................ 22

*United States v. Nixon*,
   418 U.S. 683 (1974) ......................................................................................... 26

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ....................................................................... 25

*Weisberg v. DOJ*,
   745 F.2d 1476 (D.C. Cir. 1984) ......................................................................... 6

## STATUTES

5 U.S.C. § 552 ...................................................................................................... 1
5 U.S.C. § 552(a)(3)(D) ....................................................................................... 9
5 U.S.C. § 552(a)(4)(B) ....................................................................................... 5
5 U.S.C. § 552(a)(6)(E) ........................................................................................ 3
5 U.S.C. § 552(b)(5) .................................................................................. 4, 13, 21
5 U.S.C. § 552(b)(6) ............................................................................................ 4
5 U.S.C. § 552(b)(9) .......................................................................................... 27
5 U.S.C. § 552(d) ............................................................................................... 19
5 U.S.C. §§ 551(1)(A), 552(f) ........................................................................... 22
Pub. L. No. 104-231, 110 Stat. 3048 ................................................................... 6

## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56(a) ............................................................................................ 5

## MISCELLANEOUS

American Oversight v. U.S. Dep't of Health & Human Servs., et al.,
   No. 17-cv-827 (D.D.C.) ................................................................................... 12

*OIP Guidance: Defining a "Record" Under the FOIA*, The United States Department
   of Justice, https://www.justice.gov/oip/oip-guidance/defining_a_record_
   under_the_foia (last updated Feb. 15, 2017) ........................................... 10, 11, 13

## INTRODUCTION

Plaintiff American Oversight challenges the decision of the Department of Health and Human Services ("HHS") and the Office of Management and Budget ("OMB," and with HHS, "the agencies") to redact and withhold records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.  The agencies identified the records at issue in response to a FOIA request seeking communications from the agencies to members of Congress and congressional staff (together, "Congress") about potential administrative actions related to the implementation of the Affordable Care Act.  The request sought records from March 6, 2017, through the date the agencies began their searches—a period in which there was significant executive branch and legislative activity concerning health care reform.

The focus of American Oversight's request appropriately shaped the agencies' response. First, because the request asked exclusively for communications from *the agencies*, and not for any communications from Congress, the agencies processed all of the emails they reviewed as distinct records, allowing them to more readily identify material that was actually responsive to the request.  The decision to treat separate emails (authored by senders in separate branches of government) as distinct records was a permissible—and, indeed, efficient—exercise of the agencies' responsibility for determining what constitutes a "responsive record."  *See Shapiro v. CIA*, 247 F. Supp. 3d 53, 74-75 (D.D.C. 2017)

Second, by targeting only records that addressed potential *administrative* action related to the nation's health care system, American Oversight's request unsurprisingly implicated records that reflect sensitive agency deliberations about health care policy.  Those records were appropriately withheld and redacted pursuant to FOIA Exemption 5.  One record—a letter drafted by OMB and addressed to the President (the only record withheld in full in this case)—would, if disclosed, expose the predecisional deliberations of the President's senior-most advisors and thus

is squarely protected by both the deliberative process and presidential communications privileges. And under longstanding D.C. Circuit precedent, those privileges are not waived where, as here, an executive branch official shows privileged material to members of Congress—a result compelled by Congress's decision not to permit agencies to withhold FOIA-exempt information when providing records to Congress.

The remaining records at issue in this case are emails sent to congressional staff who played an important role in the agencies' deliberations concerning health-care-related administrative action. The agencies relied on communications with congressional staff when evaluating which administrative actions to prioritize and in planning for any administrative or regulatory steps that would be necessary following the enactment of any health care reform legislation. As such, the emails at issue were "part and parcel of the agenc[ies'] deliberative process." *Dow Jones & Co, Inc.. v. DOJ*, 917 F.2d 571, 575 (D.C. Cir. 1990) (emphasis omitted). Given the role that these emails played in the agencies' deliberations about health care policy, the agencies appropriately redacted predecisional, deliberative information from the emails pursuant to the deliberative process privilege. To suggest otherwise would run afoul of decades of D.C. Circuit case law concerning the scope of Exemption 5 and, more fundamentally, would undermine the deliberative process privilege's core purpose: to protect the quality of government decision making.

The agencies' application of Exemption 5 was correct, and they therefore are entitled to summary judgment.

## BACKGROUND

On May 4, 2017, American Oversight sent the FOIA requests at issue in this case to HHS and OMB. Decl. of Michael S. Marquis ("Marquis Decl.") ¶ 4; Decl. of Heather V. Walsh ("Walsh Decl.") ¶ 5. Those requests, which were identical in substance, sought the following two categories of records:

1. A copy of any letter or memorandum sent on or about March 23, 2017 to Congressional republicans outlining potential regulatory actions related to the Affordable Care Act. The requested record was referenced in an April 4, 2017 letter from 21 Senators to Secretary Tom Price.

2. Any other communications from [the agencies] to any member of Congress or congressional staff concerning potential administrative actions relating to implementation of the Affordable Care Act.

Marquis Decl., Ex. 1 at 2; Walsh Decl., Ex. 1 at 2.

The timeframe for part 2 of the request was March 6, 2017, to the date of the agencies' search. Marquis Decl., Ex. 1 at 2; Walsh Decl., Ex. 1 at 2. American Oversight asked the agencies to order expedited processing of the requests. Marquis Decl., Ex. 1 at 6; Walsh Decl., Ex. 1 at 6; *see* 5 U.S.C. § 552(a)(6)(E).

The agencies acknowledged receipt of the requests. Marquis Decl. ¶ 9; Walsh Decl. ¶ 6. OMB began its search on May 11, 2017, and two offices in HHS began their searches several months later—the office of the Assistant Secretary for Legislation ("ASL") commenced a search on August 16, 2017, and the Immediate Office of the Secretary ("IOS") commenced a search by October 4, 2017. Walsh Decl. ¶ 7; Marquis Decl. ¶¶ 15, 17.

American Oversight filed this suit on July 20, 2017. Compl., ECF No. 1. Beginning in November, 2017, the agencies made monthly rolling productions of responsive, non-exempt material to American Oversight. *See* Status Report, Sept. 29, 2017, ECF No. 6 (relaying OMB's decision to process material at the rate of at least 500 documents per month); Minute Order, Nov. 2, 2017 (setting a processing rate of at least 400 records per month for HHS). HHS completed its productions on January 29, 2018, and OMB completed its productions on February 15, 2018. Joint Status Report, Feb. 16, 2018, ECF No. 13. After the agencies completed their productions, the parties proposed—and the Court adopted—a schedule for cross-motions for summary judgment. *See id.*; Minute Order, Feb. 20, 2018.

When producing responsive records, the principal basis on which the agencies redacted (and, in one case, withheld) pages was FOIA Exemption 5, which protects from disclosure certain information that generally would not be discoverable in litigation. *See* 5 U.S.C. § 552(b)(5). The agencies also redacted certain information, including email addresses and other contact information, pursuant to FOIA Exemption 6, which protects against disclosures that would cause "clearly unwarranted invasion of personal privacy." *Id.* § 552(b)(6). The parties have agreed, however, that the Exemption 5 redactions, and the agencies' approach to identifying responsive "records," are the principal issues in dispute in this motion, and in American Oversight's forthcoming cross-motion, for summary judgment.

## ARGUMENT

### I.     FOIA and Summary Judgment Standards of Review

Although the Freedom of Information Act "strongly favors prompt disclosure, its nine enumerated exemptions are designed to protect those 'legitimate governmental and private interests' that might be 'harmed by release of certain types of information.'" *August v. FBI*, 328 F.3d 697, 699 (D.C. Cir. 2003) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989)). Accordingly, while "disclosure, not secrecy, is the dominant objective of the Act," and while the Act's exemptions must therefore "be narrowly construed," the exemptions also must be given "meaningful reach and application" in order to achieve the "workable balance" that Congress has struck "between the right of the public to know and the need of the Government to keep information in confidence." *John Doe Agency*, 493 U.S. at 152 (citations omitted). The agencies bear the burden of justifying the withholding of material responsive to American Oversight's FOIA request, and this Court reviews the agencies' response to that request *de novo*. *See* 5 U.S.C. § 552(a)(4)(B).

4

"Most FOIA cases are appropriately resolved on motions for summary judgment." *Gilliam v. DOJ*, 128 F. Supp. 3d 134, 138 (D.D.C. 2015) (citing *Brayton v. Office of U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011)). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The defendant in a FOIA case must show that its search for responsive records was adequate, that any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed after redaction of exempt information." *Light v. DOJ*, 968 F. Supp. 2d 11, 23 (D.D.C. 2013).

A court may award summary judgment in a FOIA action solely on the basis of information provided by the agency through declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail," that "demonstrate that the information withheld logically falls within the claimed exemption[s]," and that are "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981) (footnote omitted). "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears logical or plausible" to the court. *Judicial Watch, Inc. v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) (per curiam) (citation omitted).

## II.     The Agencies Conducted Adequate Searches for Responsive Records

An agency is entitled to summary judgment in a FOIA case with respect to the adequacy of its search if the agency shows "that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) (citations omitted), *superseded by statute on other grounds by* Electronic FOIA Amendments 1996, Pub. L. No. 104–231, 110 Stat. 3048. "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents

was *adequate*." *Weisberg v. DOJ*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (citation omitted).  And "[a]n agency may establish the adequacy of its search by submitting reasonably detailed, nonconclusory affidavits describing its efforts." *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 318 (D.C. Cir. 2006).  "Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (citation omitted).

Applying these principles, the agencies are entitled to summary judgment with respect to the adequacy of their searches.  As detailed in the Walsh and Marquis Declarations, the agencies searched all locations where records responsive to American Oversight's FOIA requests were reasonably likely to be found.  *See* Walsh Decl. ¶ 10; Marquis Decl. ¶ 18.

First, with respect to OMB, the agency conducted a comprehensive search of the Outlook accounts of the officials that were reasonably likely to have communicated with members of Congress or congressional staff.  Walsh Decl. ¶¶ 7, 8.  Searching officials' Outlook accounts, where emails exchanged with Congress would be located, was reasonable in light of OMB's general practice of using email to conduct agency business and in light of confirmation from leadership in the agency's Health Division that there was no reason to believe OMB broke with that practice for communications on the topic of American Oversight's request.  *See id.* ¶ 7.  Moreover, the search terms OMB used cast a wide net.  The agency searched emails sent to, received from, or with a cc from the relevant congressional email domains (@mail.house.gov or senate.gov), and it used search terms that would pick up emails relating to the Affordable Care Act or health care reform.  *Id.* ¶ 9.  Specifically, the agency searched for emails with the terms "health*," "AHCA," "ACA," "Affordable Care Act," or "ObamaCare," and the asterisk at the end

of the "health*" search term ensured that OMB received emails where the word "health" was part of another word (such as "healthcare" or the "American Health Care Act"). *Id.*

OMB then reviewed the more than 1,900 documents that were identified as potentially responsive, reviewing each email within those documents as a separate record. *Id.* ¶¶ 12, 13. Additionally, to ensure the agency identified any records responsive to part 1 of the request (seeking a particular letter that was allegedly sent to Republican members of Congress), staff from the agency's Office of General Counsel met with individuals involved in the preparation of any such record—or one similar to it—to locate copies of it. *Id.* ¶ 7.  Taken together, OMB's search could reasonably be "expected to produce the information requested," and the search accordingly was adequate. *Oglesby*, 920 F.2d at 68.

Turning to HHS's search, the agency sent American Oversight's request to the two HHS offices that were reasonably likely to have responsive records: the Immediate Office of the Secretary ("IOS") and the Office of the Assistant Secretary for Legislation ("ASL").  Marquis Decl. ¶ 12.  Those offices are responsible, respectively, for the operation and coordination of the work of the Secretary of Health and Human Services (including former Secretary Price's involvement in the health care reform process), and for liaising with Congress and developing and implementing the agency's legislative agenda. *Id.* ¶¶ 13, 14.

Each office within HHS conducted a broad search for responsive records.  IOS searched the Outlook files and .pst email archives of the political appointees and Senior Executive Service officials in the Secretary's office during the time period relevant to the request. *Id.* ¶ 17.  To target communications with Congress, IOS used "mail.house" and "senate.gov" (components of the relevant domain names) as search terms, along with "Regulat!" and "Admi!" as subject-matter search terms. *Id.*  These subject matter search terms would have caught any record that includes

"regulat" or "admi" as part of a word or phrase—ensuring that any Outlook record discussing regulatory or administrative action likely would have been found by the search. *Id.* The resulting search identified as potentially responsive any email that had one (or more) of the domain-name search terms *and* one (or more) of the subject-matter search terms. *See id.* That turned out to be approximately 6 gigabytes worth of potentially responsive material, but after filtering the communications to include only communications sent *from* HHS custodians to members of Congress or congressional staff (in light of the scope of American Oversight's request), and following an initial review for responsiveness, the search returned only approximately 30 potentially responsive email files. *Id.*

ASL likewise searched the Outlook files of the custodians that reasonably could have been expected to have sent communications to congressional staff or members of Congress on the topic of American Oversight's request. *Id.* ¶ 15. And it used the same terms as IOS, but all in the disjunctive (so any email identified through a search for "mail.house", "senate.gov", "regulat!", *or* "admi!" would have been returned as potentially responsive). *See id.* This resulted in the identification of approximately 3,150 email files. *Id.* Additionally, ASL conducted a supplemental search for documents that were specifically responsive to part 1 of the request. *Id.* ¶ 16. Specifically, the ASL Director of Oversight and Investigations consulted with agency officials likely to be knowledgeable about any documents that may have been shared with Congress regarding potential regulatory or administrative healthcare reform efforts, but which might *not* have been expected to appear in the agency's email records searches. *Id.* That additional search identified two responsive records. *Id.*

In reviewing the universe of potentially responsive email files and other documents, HHS treated each email communication as a distinct record, given American Oversight's focus on

communications from the agency.  *Id.* ¶ 22.  Accordingly, HHS processed emails from HHS as responsive records, and emails from members of Congress or congressional staff as non-responsive records.  *Id.*

By taking the steps described above, HHS employed a reasonable and adequate search "using methods which can be reasonably expected to produce the information requested." *Oglesby*, 920 F.2d at 68 (citations omitted).  As such, both agencies are entitled to summary judgment with respect to the adequacy of their searches.

## III.   The Agencies' Decision to Treat Distinct Emails as Separate Records Was Consistent with American Oversight's FOIA Request and Permissible Under FOIA.

When the agencies identified and produced emails responsive to American Oversight's FOIA requests, they processed each email they reviewed as a distinct record.  That approach was suggested by the requests themselves, which sought only emails from *the agencies*, not emails from Congress or back-and-forth email exchanges between Congress and the agencies.  *See* Marquis Decl., Ex. 1 at 2; Walsh Decl., Ex. 1 at 2 (seeking "communications *from* [the agencies] to any member of Congress or congressional staff" (emphasis added)); *see also id.* (requesting a "letter or memorandum sent . . . *to* Congressional Republicans" (emphasis added)).  Emails from Congress, accordingly, were not responsive to the requests, and the agencies did not produce them. And when emails from Congress appeared in an email "thread," those separate emails were redacted as non-responsive records.  These decisions—to treat separate emails, authored by senders in separate branches of government, as distinct records, and to process and produce responsive records accordingly—were plainly permitted under FOIA.

FOIA instructs agencies to search for, locate, and (when appropriate) produce "those records which are *responsive* to a [FOIA] request."  5 U.S.C. § 552(a)(3)(D) (emphasis added). Once an agency determines that it will produce a responsive record, it cannot redact *information*

from that record solely "on the basis that the information is non-responsive." *Am. Immigration Lawyers Ass'n v. Exec. Office of Immigration Review* ("AILA"), 830 F.3d 667, 677 (D.C. Cir. 2016). But when an agency determines that a *record* is non-responsive, there is generally no obligation to disclose the record. *See Parker v. DOJ, Office of Prof'l Responsibility*, 278 F. Supp. 3d 446, 451 (D.D.C. 2017).

As the D.C. Circuit recently explained, the initial responsibility for determining what constitutes a "record" rests with the "agency itself." *AILA*, 830 F.3d at 678 (emphasis omitted); *see also Shapiro v. CIA*, 247 F. Supp. 3d 53, 74 (D.D.C. 2017) ("[T]he *AILA* court grounded its analysis upon the agency's own definition of a responsive record."). An agency "in effect define[s] a 'record' when [it] undertake[s] the process of identifying records that are responsive to a [FOIA] request." *AILA*, 830 F.3d at 678. The definition of a "record" thus depends on the particular context in which an agency conducts a search and processes potentially responsive material. In other words, there is no one-size-fits-all definition of a "record." Rather, as courts in this district have recognized, there are a number of factors that can guide agencies in determining what constitutes a "record" in a given case, including "the requester's intent, maintaining the integrity of the released documents, the scope of the request, the agency's own knowledge regarding storage and maintenance of documents, efficiency, cost, resource allocation, and maintaining the public's trust in transparency." *Shapiro*, 247 F. Supp. 3d at 74-75 (holding that the FBI's practice of identifying "responsive results [that were] contained on pages within larger documents" was consistent with these factors); *see also Parker*, 278 F. Supp. 3d at 451.

Recent guidance from the Department of Justice's Office of Information Policy ("OIP"), issued after the D.C. Circuit's decision in *AILA*, reinforces this context-dependent approach to the definition of a "record." *See OIP Guidance: Defining a "Record" Under the FOIA*, The United

States Department of Justice, https://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia (last updated Feb. 15, 2017); *see also AILA*, 830 F.3d at 678 (relying on prior OIP guidance as a marker for what constitutes a "record").  That guidance addresses the specific question of whether to classify emails as distinct records, explaining that "an entire string of emails, a single email within a string of emails, or [even] a paragraph within a single email could potentially constitute a 'record' for purposes of the FOIA," depending on "the subject of a particular FOIA request."  *OIP Guidance*, *supra*.

The process the agencies employed to identify records responsive to American Oversight's FOIA request appropriately treated each email reviewed as a distinct record.  As explained in the Marquis and Walsh declarations, the agencies used the author of each communication reviewed to identify whether the communication was responsive to American Oversight's requests.  *See* Marquis Decl. ¶ 22; Walsh Decl. ¶ 13; *see also Shapiro*, 247 F. Supp. 3d at 75 (noting that the "presumption of good faith" applies to an agency's "definition of a responsive record").

That process was consistent with factors identified in *Shapiro* and the guidance from OIP. *See* 247 F. Supp. 3d at 74-75; *OIP Guidance*, *supra*.  First, and most significantly, the scope of the requests themselves (and the intent that is evident from the face of the requests) strongly support the agencies' decision to treat separate emails as separate records.  It was American Oversight that first made salient the distinction between the sender and recipient of an email by focusing its requests on communications *from* the agencies to members of Congress and congressional staff. Marquis Decl., Ex. 1 at 2; Walsh Decl., Ex. 1 at 2.  That distinction is reinforced elsewhere in the requests, where American Oversight makes clear that it is interested in the "steps *the administration* is taking" with respect to health care reform.  Marquis Decl., Ex. 1 at 2 (emphasis added); Walsh Decl., Ex. 1 at 2 (emphasis added).  Moreover, American Oversight's decision to

11

seek only communications from the agencies in these requests stands in marked contrast to other requests American Oversight has filed, with these same agencies, on similar topics. *See, e.g.*, Compl., Ex. A at 2, American Oversight v. U.S. Dep't of Health & Human Servs., et al., No. 17-cv-827 (D.D.C.), ECF No. 1-1 (requesting "[a]ll communications . . . exchanged *between* HHS and any members of Congress or congressional staff relating to health care reform" (emphasis added)).  When the agencies were deciding how to locate and process responsive records, it was reasonable—and indeed, desirable—for them to take into account what American Oversight was requesting and the extent to which the requests at issue reflected a different focus than other requests the agencies had received from the same requester.

Additionally, in light of the focus of American Oversight's request, it was more efficient for the agencies to consider each email they reviewed as a separate record. *See Shapiro*, 247 F. Supp. 3d at 75 (listing "efficiency, cost, [and] resource allocation" as relevant factors).  Doing so ensured that the agencies did not devote unnecessary time and resources to parsing non-responsive records for exempt material on a line-by-line basis—an obligation the agencies would have had if they grouped all of the emails in a thread together as one record. *See AILA*, 830 F.3d at 679 (remanding for a determination as to whether information within a responsive record "might be permissibly redacted as statutorily exempt").  When agencies make a practice of shaping their responses to FOIA requests in light of these kinds of "practical considerations," it ensures they are not hindered in their "ability to process multiple requests efficiently or allocate [their] resources effectively." *Shapiro*, 247 F. Supp. 3d at 75.

Finally, for the records the agencies identified as responsive, the agencies "did not withhold single sentences, or even paragraphs, as non-responsive," consistent with the distinction between non-responsive records, which need not be produced, and non-responsive information (in an

otherwise-responsive record), which must be. *Shapiro*, 247 F. Supp. 3d at 75; *see also OIP Guidance*, *supra* (explaining that agencies should consider whether a "document can reasonably be broken into discrete units" when determining what constitutes a "record" for purpose of a particular FOIA request).

In sum, the process the agencies employed for responding to American Oversight's requests appropriately took account of the nature of the requests, the competing demands on agency resources, and the relevant factors identified by the D.C. Circuit, courts in this district, and OIP. The agencies thus are entitled to summary judgment with respect to their determination that separate emails constituted separate records, and their related decision not to produce non-responsive emails contained in email threads.

## IV. The Agencies Properly Withheld and Redacted Records Under FOIA Exemption 5.

American Oversight's FOIA requests sought records concerning possible administrative actions that would address problems with the nation's health care system. Given both the importance and political sensitivity of health care policy, particularly during the time period relevant to American Oversight's requests, the responsive records included communications and draft documents whose disclosure would reveal the agencies' deliberative processes and, in at least one case, intrude on the deliberations of senior advisers to the President. In light of those concerns, the agencies appropriately withheld and redacted information pursuant to FOIA Exemption 5.

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption ensures that members of the public cannot obtain through FOIA records that would be "normally privileged in the civil discovery context." *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975). Specifically, "Exemption 5 incorporates two

13

executive privileges that are relevant here," the deliberative process privilege and the presidential communications privilege.  *Loving v. DOD*, 550 F.3d 32, 37 (D.C. Cir. 2008)

The deliberative process privilege protects "materials that would reveal advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated."  *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997) (citation omitted).  "The deliberative process privilege rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news, and its object is to enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government."  *DOI v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001) (citations omitted).  The privilege also "protects the public from the confusion that would result from premature exposure to discussions occurring before" a final decision has been made and ensures "the integrity of the decision-making process itself by confirming that officials should be judged by what they decided, not for matters they considered before making up their minds."  *Russell v. Dep't of Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982) (alterations and citation omitted).

To come within the scope of the deliberative process privilege, a document must be both predecisional and deliberative.  *Coastal States Gas Corp. v. DOE*, 617 F.2d 854, 866 (D.C. Cir. 1980).  A document is predecisional if "it was generated before the adoption of an agency policy," and it is deliberative if "it reflects the give-and-take of the consultative process."  *Id.*  "To establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role that the documents at issue played in that process." *Judicial Watch v. Export-Import Bank*, 108 F. Supp. 2d 19, 35 (D.D.C. 2000) (citing *Formaldehyde Inst. v. HHS*, 889 F.2d 1118, 1223 (D.C. Cir. 1989)).  Accordingly, "even if an

14

internal discussion does not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process." *Gold Anti-Tr. Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 135–36 (D.D.C. 2011) (citation omitted).  When evaluating deliberative process claims, courts "must give considerable deference to the agency's explanation of its decisional process, due to the agency's expertise in determining what confidentiality is needed to prevent injury to the quality of agency decisions, while the decisionmaking process is in progress." *Pfeiffer v. CIA*, 721 F. Supp. 337, 340 (D.D.C. 1989) (citation omitted).

The presidential communications privilege "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially."  *Loving*, 550 F.3d at 37; *see also Judicial Watch, Inc. v. DOJ*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (describing the privilege as "fundamental to the operation of Government and inextricably rooted in the separation of powers under the Constitution" (citation omitted)).  The privilege protects "'communications directly involving and documents actually viewed by the President,' as well as documents 'solicited and received' by the President or his 'immediate White House advisers [with] . . . broad and significant responsibility for investigating and formulating the advice to be given the President.'"  *Loving*, 550 F.3d at 37 (alterations in original) (quoting *Judicial Watch*, 365 F.3d at 1114).  The privilege thus protects in its entirety "the President's personal decision-making process," including the gathering of information by White House staff that is relevant to that process.  *See Judicial Watch*, 365 F.3d at 1118.  Moreover, unlike the deliberative process privilege, which protects the deliberative portions of predecisional documents, "the presidential communications privilege 'applies to documents in their entirety, and covers final and

postdecisional materials as well as pre-deliberative ones.'" *Ctr. for Effective Gov't v. Dep't of State*, 7 F. Supp. 3d 16, 22 (D.D.C. 2013) (citing *In re Sealed Case*, 121 F.3d at 745).

###### A.   OMB Properly Withheld in Full a Draft Letter to the President Requested and Reviewed by the President's Senior Advisors.

The only record withheld in full in this case is a draft of a letter, addressed to the President, concerning potential regulatory actions that the administration could take related to the Affordable Care Act.  *See* Decl. of Emma K. Doyle ("Doyle Decl.") ¶ 6; Walsh Decl. ¶ 22.  That draft letter was prepared by OMB staff and was reviewed by the President's senior advisors, including the Director of OMB and the Director of the Domestic Policy Council.  Doyle Decl. ¶ 6.  The letter outlined for the President potential regulatory actions that the administration could take with respect to the Affordable Care Act.  *Id.*  As such, the letter was properly withheld as predecisional and deliberative, as well as pursuant to the presidential communications privilege.  Moreover, neither the deliberative process privilege nor the presidential communications privilege was waived when the draft letter was shown to several members of Congress.

###### 1.   The Draft Letter Is Subject to the Deliberative Process Privilege.

The draft letter falls squarely within the ambit of the deliberative process privilege. Because the letter outlined "*potential* regulatory actions related to the Affordable Care Act," the letter preceded any decision by the administration as to whether to implement those regulatory actions.   Doyle Decl. ¶ 6.   As such, the letter "was generated before the adoption of an [administration] policy" on those regulatory actions and is "predecisional."  *Coastal States Gas Corp.*, 617 F.2d at 866.

Moreover, the letter is clearly deliberative—it is a draft of a letter that, in final form, would have laid out options for the President pertaining to health-care-related regulatory actions.  *See* Doyle Decl. ¶ 6.  When agency officials advise decision-makers about particular policy options,

16

such communications are quintessentially deliberative. *See CREW v. NARA*, 583 F. Supp. 2d 146, 162 (D.D.C. 2008). Revealing specific proposals that OMB presented to the President would expose a key component of the "process by which governmental decisions and policies are formulated" at the highest levels. *In re Sealed Case*, 121 F.3d at 737. And here, that injury to the deliberative process would be compounded because the record at issue is a draft, reflecting non-final agency views as to how best to advise the President. *See Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 161 F. Supp. 3d 120, 129 (D.D.C.), *as modified*, 185 F. Supp. 3d 26 (D.D.C. 2016) (citing cases where courts in this district have held "that drafts are protected by the deliberative process privilege"). The fact that the draft was shared outside of OMB with other senior presidential advisors, *see* Doyle Decl. ¶¶ 6, 7, does not alter the draft's status as a predecisional, deliberative document. *See Judicial Watch, Inc. v. DOE*, 412 F.3d 125, 131 (D.C. Cir. 2005) ("[W]hat matters" in applying the deliberative process privilege "is whether a document will expose the pre-decisional and deliberative processes of the Executive Branch."). To hold that even drafts of substantive letters to the President are not deliberative would cut to the core of the information the deliberative process privilege protects and would undermine the candor required for effective government decision-making. *See Sears*, 421 U.S. at 151 ("Manifestly, the ultimate purpose of this long-recognized privilege is to prevent injury to the quality of agency decisions.").

### 2. *The Draft Letter Is Subject to the Presidential Communications Privilege.*

Disclosing the draft letter would not simply reveal sensitive deliberative information; it would, more specifically, reveal information "solicited and received" by the President's "immediate White House advisers"—individuals "who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'" *Judicial Watch*, 365 F.3d at 1114 (quoting *In re Sealed Case*, 121 F.3d at 752). Because those advisers were responsible for

advising the President about health-care-related regulatory actions—*i.e.*, the topic the letter specifically addressed—the draft letter falls within the presidential communications privilege.

The presidential advisers who requested and reviewed the draft letter include Director Mulvaney and Andrew Bremberg, an Assistant to the Presdient and Director of the Domestic Policy Counsel.   Doyle Decl. ¶ 6.   Mr. Bremberg is the President's senior-most advisor for domestic policy.   *Id.* at 2 n.1; *see also Judicial Watch*, 365 F.3d at 1123 (extending presidential communications privilege to the President's "immediate advisers in the Office of the President"). He and Director Mulvaney received the draft letter "in the course of performing their function of advising the President on official government matters."   *In re Sealed Case*, 121 F.3d at 752; *see also* Doyle Decl. ¶ 6 (explaining that their "receipt and review of the letter contributed to advice they provided the President about potential health-care-related regulatory actions").

In light of these facts, the draft letter is subject to the presidential communications privilege.   As the D.C. Circuit has emphasized, "Presidential advisers do not explore alternatives only in conversations with the President or pull their final advice to him out of thin air[.]"   *In re Sealed Case*, 121 F.3d at 750.   Rather, "in the course of preparing advice for the President," senior advisers "need . . . sufficient elbow room . . . to obtain information from all knowledgeable sources[.]"   *Id.* at 752.   Ensuring that the President's closest advisers can review policy proposals, such as those in the draft letter, that will shape their recommendations to the President "preserves the President's ability to obtain candid and informed opinions from his advisors[.]"   *Loving*, 550 F.3d at 37.   As such, the presidential communications applies to the draft letter received by Director Mulvaney and Mr. Bremberg**.**

> ### 3.   *Showing the Draft Letter to Members of Congress Did Not Waive Either Privilege.*

The Exemption 5 privileges that apply to the draft letter were not waived when Director Mulvaney and other senior advisers showed the letter to several members of Congress. *See* Doyle Decl. ¶ 7. That is because "disclosure to Congress [does] not waive Exemption 5 protection" for materials that are otherwise exempt. *Rockwell Int'l Corp. v. DOJ*, 235 F.3d 598, 605 (D.C. Cir. 2001).

The D.C. Circuit established this rule regarding waiver in *Murphy v. Department of Army*, 613 F.2d 1151 (D.C. Cir. 1979). There, the court held that the Army did not waive the applicability of Exemption 5 when it disclosed to a congressman a memorandum that was subject to the deliberative process privilege. *Id.* at 1154-55. Such disclosure, the court reasoned, "could not have had th[e] consequence" of waiving Exemption 5 because FOIA expressly provides that the exemptions enumerated in the statute do not apply to information that agencies provide to Congress. *Id.* at 1155 (citation omitted); *see also* 5 U.S.C. § 552(d). It did not matter that the disclosure was not to Congress as an entity, to a congressional committee, or even to a committee chairman. *Murphy*, 613, F.2d at 1156-57. Rather, disclosure in any of those contexts, as well as to an individual congressman, does not waive an agency's invocation of Exemption 5. *Id.* If the rule were otherwise, agencies would become significantly "more cautious in furnishing sensitive information to the legislative branch[,] a development at odds with public policy which encourages broad congressional access to governmental information." *Id.* at 1156.

Several decades later, the D.C. Circuit reaffirmed that *Murphy* remains controlling law. *Rockwell*, 235 F.3d at 604. The *Rockwell* court confirmed the breadth of the holding in *Murphy*, highlighting that the Army's memorandum in that case was subject to Exemption 5 even though the agency "had made '[n]o specific request' and the congressman no specific promise to keep the document confidential." *Id.* at 604; *see also Heggestad v. DOJ*, 182 F. Supp. 2d 1, 13 (D.D.C.

2000) ("[T]his Circuit has explicitly held that a document otherwise covered by the deliberative process privilege does not lose this status merely because it was disclosed to a member of Congress without an explicit warning of its confidential status.").

Here, as in *Murphy*, the decision to disclose a single document to a member (or members) of Congress does not invalidate OMB's assertion of Exemption 5.  If anything, the claim to Exemption 5 protection is stronger in this case because OMB did not even turn over possession of the draft letter or otherwise indicate that the members would be permitted to keep it.  *Compare* Doyle Decl. ¶ 7, *with Murphy*, 613 F.2d at 1153; *see also Students Against Genocide v. Dep't of State*, 257 F.3d 828, 836-37 (D.C. Cir. 2001) (holding that the government did not waive applicable FOIA exemptions by displaying photographs to delegates at a United Nations ("UN") Security Council meeting and emphasizing that "[then-UN] Ambassador Albright displayed, but did not distribute, the photographs in question").  In fact, the draft letter was clearly marked as a draft that was predecisional and deliberative, highlighting that OMB still considered the letter to be subject to the deliberative process privilege.  *See* Doyle Decl. ¶ 7.  Finally, given that the draft letter pertains to administrative measures concerning the Affordable Care Act—a subject in which both the executive and legislative branches have a significant interest—holding that the Exemption 5 privileges are waived here would deter agencies from disclosing information about important policy issues to Congress.  As the *Murphy* court emphasized, FOIA is structured to avoid precisely that result.  *See* 613 F.2d at 1156.

Under these circumstances, and absent any indication that OMB actually "intend[ed] to waive the [draft letter's] confidentiality," this Court should "find no Exemption 5 waiver." *Rockwell*, 235 F.3d at 604.  Accordingly, OMB is entitled to summary judgment with respect to its decision to withhold the draft letter.

**B. The Agencies Properly Redacted Emails Sent to Congress Pursuant to the Deliberative Process Privilege.**

The remaining redactions at issue in this case are all from emails that officials at the agencies—mostly from HHS, but in one case from OMB—sent to Congress. Disclosing the redacted information from those emails would reveal the agency's predecisional deliberations about possible administrative actions pertaining to health care reform and the Affordable Care Act. In light of the role the communications played in the agencies' deliberative process, the redacted emails are subject to Exemption 5.

### 1. The Redacted Emails Qualify as "Intra-Agency" Communications for Purposes of Exemption 5.

Exemption 5 protects from disclosure certain "inter-agency or intra-agency" communications. 5 U.S.C. § 552(b)(5). But it is "well established" that "a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency'" for purposes of Exemption 5. *Nat'l Inst. of Military Justice [NIMJ] v. DOD*, 512 F.3d 677, 684 (D.C. Cir. 2008). Rather, "Exemption 5 permits an agency to protect the confidentiality of communications from outside the agency so long as those communications are part and parcel of *the agency's* deliberative process." *Dow Jones & Co, Inc.. v. DOJ*, 917 F.2d 571, 575 (D.C. Cir. 1990). The "pertinent element" in determining whether a communication is "intra-agency" is "the role, if any, that the document plays in the process of agency deliberations." *Formaldehyde*, 889 F.2d at 1123 (quoting *CNA Fin. Corp. v. Donovan*, 830 F.2d 1132, 1161-62 (D.C. Cir. 1987)).

The D.C Circuit adopted this interpretation of "intra-agency" by looking at "the language of Exemption 5" and interpreting that language "in light of its purpose." *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980). In *Ryan*, the court explained that Exemption 5 "was created to protect the deliberative process of the government" and that communications with individuals and entities outside of agencies were an important source of "opinions and recommendations" and thus "an

21

integral part of [that] deliberative process." *Id.* at 789.  Because exposing such communications to "public view would inhibit frank discussion of policy matters and likely impair the quality of decisions," the court found that they "clearly" are subject to Exemption 5.  *Id.* at 789-90.

Justice Scalia advocated this interpretation of Exemption 5's text as both a "permissible and desirable reading of the statute."  *See U.S. DOJ v. Julian*, 486 U.S. 1, 19 n.1 (1988) (Scalia, J., dissenting).  Specifically, he explained that "[i]t is textually possible and much more in accord with the purpose of the provision, to regard as an intra-agency memorandum one that has been received by an agency, to assist it in the performance of its own functions, from a person acting in a governmentally conferred capacity other than on behalf of another agency," including as "an employee or officer of another governmental unit (not an agency) that is authorized or required to provide advice to the agency."  *Id.*

Consistent with that reading, and as relevant here, even though the D.C. Circuit has held that Congress is not an "agency" within the meaning of FOIA, *Dow Jones*, 917 F.2d at 574, it has held that "communications between an agency and Congress [sh]ould receive protection as intra-agency memoranda if they were 'part and parcel of the agency's deliberative process.'"  *Rockwell*, 235 F.3d at 604 (quoting *Dow Jones*, 917 F.2d at 573–75).[1]   Communications between the executive branch and Congress were at issue in *Ryan*, yet the D.C. Circuit held that senators' responses to a questionnaire from the Attorney General about "procedures for selecting and

---

[1] Interpreting the enactment of Exemption 5 together with Congress's decision to exempt itself from the burdens of FOIA, *see* 5 U.S.C. §§ 551(1)(A), 552(f), also supports the conclusion that deliberative communications between Congress and the Executive Branch are "*inter*-agency" records for purposes of Exemption 5.  The structure of FOIA is inconsistent with a finding that when an entity that is entirely exempt from FOIA (Congress) communicates with an entity that may invoke the deliberative process privilege (an Executive Branch agency), the result is that *both* entities lose *all* protection over their deliberations.  The D.C. Circuit, however, has declined to adopt this reading of the statute.  *See Dow Jones*, 917 F.2d at 574-75.

recommending potential [judicial] nominees" were "exempt from FOIA disclosure under Exemption 5" as "intra-agency memorand[a]."  617 F.2d at 784, 791.

The D.C. Circuit has reaffirmed the holding and reasoning from *Ryan* in a series of cases involving communications with different non-agencies.  In *Formaldehyde Institute v. HHS*, the court held that comments sent to HHS from an epidemiology journal's outside reviewers were "clearly . . . part of HHS' deliberative process" because they contributed to the agency's decision over whether to publish a report submitted by an HHS staff member.  889 F.2d at 1120.  In *Public Citizen, Inc. v. DOJ*, 111 F.3d 168 (D.C. Cir. 1997), communications relating to presidential records between two former presidents and two agencies were held to be "intra-agency" for purposes of Exemption 5 because the former presidents "clearly qualifie[d]" as outside experts "on the implications of disclosure of Presidential records."  *Id.* at 169, 171.  In *Judicial Watch, Inc. v. DOE*, 412 F.3d 125 (D.C. Cir. 2005), the court followed this "well established" principle by protecting documents shared with or received from a presidentially established entity, the National Energy Policy Development Group, that was clearly not an agency.  *Id.* at 130-31.  And in *NIMJ*, the court held that "records containing the opinions and recommendations of non-governmental lawyers" who were advising the Department of Defense about terrorist trial commissions were protected by Exemption 5.  512 F.3d at 678.

As the Supreme Court has emphasized, however, certain communications with non-agencies cannot be considered "intra-agency" for purposes of Exemption 5.  *See Klamath*, 532 U.S. at 12.  In *Klamath*, the Court held that documents exchanged between American Indian Tribes and the Department of the Interior were not subject to Exemption 5.  *Klamath*, 532 U.S. at 4-5. The documents at issue "addressed tribal interests subject to state and federal proceedings to determine water allocations," and the Tribes' interests were adverse to the interests of a local water

users association "owing to scarcity of water." *Id.* at 4, 6.   The Court concluded that Interior's communications with the Tribes were not intra-agency memoranda because the Tribes were "self-advocates at the expense of others,"—"others" meaning entities like the local water users association—and were "seeking benefits inadequate to satisfy everyone." *Id.* at 12.

In reaching that conclusion, the Court acknowledged the D.C. Circuit's cases governing the scope of Exemption 5.  *See* 532 U.S. at 12 n.4.  But although the Court raised questions about those cases in dicta, it expressly declined to overrule them.  *Id.*  Following the Court's decision in *Klamath*, the D.C. Circuit has reaffirmed *Ryan* and in its progeny on multiple occasions.  *See Judicial Watch*, 412 F.3d at 130 (holding that "[o]ur interpretation of Exemption 5 is not inconsistent with its textual limitation to 'intra-agency' or 'inter-agency' communications" in light of "the principle, well established in this circuit, that a document need not be created by an agency or remain in the possession of the agency in order to qualify as 'intra-agency'"); *see also NIMJ*, 512 F.3d at 684; *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 336-37 (D.C. Cir. 2011).

Taken together, the D.C. Circuit's case law on Exemption 5 and the holding from *Klamath* establish "the following rule in [this] circuit: When communications between an agency and a non-agency aid the agency's decision-making process and the non-agency did not have an outside interest in obtaining a benefit that is at the expense of competitors, the communication *must* be considered an intra-agency communication for the purposes of FOIA Exemption 5."  *Judicial Watch, Inc. v. U.S. Dep't of Transp.*, 950 F. Supp. 2d 213, 218-19 (D.D.C. 2013) (emphasis added).

Applying that rule here confirms that the redacted emails are "intra-agency" communications for purposes of Exemption 5.  As explained in the declarations submitted by the agencies, communications with Congress about health-care-related administrative actions were a

part of the agencies' deliberations about the range of possible administrative actions and which particular actions to take. Arbes Decl. ¶ 8; Walsh Decl. ¶ 20. Such communications "informed HHS' decision-making about potential administrative or regulatory initiatives under consideration" and were part of HHS's effort to "understand broader congressional perspectives about how healthcare reform might be implemented in terms of administrative action." Arbes Decl. ¶¶ 8, 9; *see also* Walsh Decl. ¶ 20 (email between agency and congressional staff reflected predecisional discussion of assessment of potential regulatory options). The HHS communications included discussions of plans for then-Secretary Price to engage with certain congressional constituencies about the administrative or regulatory efforts under consideration—discussions that reveal details of the administration's thinking about those efforts and its strategy for engaging with Congress. *See* Arbes Decl. ¶ 10; *see also, e.g.*, Marquis Decl., Ex. 6 ("HHS Vaughn[2] Index") at Bates No. 0079. Given the role that the communications at issue in this case played in the agencies' own policy planning surrounding health care reform, the communications plainly were "part and parcel of the agenc[ies'] deliberative process." *Dow Jones*, 917 F.2d at 575 (emphasis omitted).

Moreover, the members of Congress and congressional staff with whom the agencies exchanged the redacted emails were not "self-advocates" seeking a particular government benefit "at the expense of others." *Klamath*, 532 U.S. at 12. To be sure, these individuals may well have had viewpoints on policy, as do many outsiders who are integral to an agency's deliberations, as well as individuals *within* an agency or elsewhere in the executive branch who choose to weigh in on a particular issue. But voicing those views is not the same as seeking a government benefit, like the water rights at issue in *Klamath*, where the agency will make a determination that directly affects the outsider's tangible interests. *See id.* at 4-6. Put differently, a non-agency cannot truly

---

[2] *See Vaughn v. Rosen*, 523 F.2d 1136 (D.C. Cir. 1975).

be considered a part of an agency's internal deliberations—such that communications with the agency should be deemed "intra-agency" for purposes of Exemption 5—if the non-agency is itself the subject of the decision the agency is contemplating.  But because that dynamic is absent here, *Klamath* poses no obstacle to treating the redacted emails as intra-agency communications.

Finally, declining to consider the redacted emails intra-agency communications would impair agency decision-making and restrict the process by which the executive branch and Congress tackle the most challenging public policy problems.  As the Supreme Court has long recognized, "those who expect public dissemination of their remarks may well temper candor with a concern for appearances . . . to the detriment of the decisionmaking process." *Sears*, 421 U.S. at 150-51 (quoting *United States v. Nixon*, 418 U.S. 683, 705 (1974)).  The deliberative process thus preserves "the frank exchange of ideas and opinions" that is necessary for effective decision-making.  *Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 462 (D.C. Cir. 2014) (citation omitted).  Compelling disclosure of the redacted emails, accordingly, would undermine the animating purpose of the deliberative process privilege by discouraging candid conversations between policymakers in the executive branch and Congress, and, in turn, by deterring agency decision-makers from seeking out valuable congressional insight.  *See* Walsh Decl. ¶ 21; Arbes Decl. ¶ 12.

At bottom, the disclosure of the communications that American Oversight seeks would cause foreseeable harm by impairing the government decision-making that the deliberative process privilege is meant to protect.  This Court should not narrow the D.C. Circuit's reading of Exemption 5 to impose that result.

## 2. The Material Redacted from the Emails Is Both "Predecisional" and "Deliberative."

The redacted emails contain the kind of information that courts routinely protect under the deliberative process privilege.  Specifically, the emails reveal the proposals and strategies under

consideration at the agencies regarding potential administrative action related to health care reform and the Affordable Care Act. *See* Arbes Decl. ¶¶ 8-10; HHS Vaughn Index; Walsh Decl. ¶ 20. Because the communications discussed or related to actions that were under consideration, but had not yet been taken, they are all predecisional. *See Coastal States Gas Corp.*, 617 F.2d at 866.

Moreover, the redacted material is deliberative because it "reveals what the agenc[ies] [were] considering" with respect to health-care-related administrative actions. *Pub. Emps. for Envtl. Responsibility v. Office of Sci. & Tech. Policy*, 881 F. Supp. 2d 8, 17 (D.D.C. 2012). As reflected in HHS's *Vaughn* index and the Arbes and Walsh declarations, the redacted emails discuss specific policy proposals and reveal what officials in the agencies were thinking as they assessed possible administrative actions. *See* Arbes Decl. ¶¶ 8-10; HHS Vaughn Index; Walsh Decl. ¶ 20. Some emails also address agency strategies for engaging with Congress or provide preliminary assessments of potential health care policy changes. *See* HHS Vaughn Index Bates Nos.00079, 00102-05, 00108-09, 00111-16. The material redacted from the emails accordingly is subject to the deliberative process privilege and thus is protected by Exemption 5.

## C.  The Agencies Processed and Released All Reasonably Segregable Information

FOIA requires that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection." 5 U.S.C. § 552(b)(9). But an agency need not disclose records in which the nonexempt information remaining is meaningless. *See Nat'l Sec. Archive Fund, Inc. v. CIA*, 402 F. Supp. 2d 211, 220-21 (D.D.C. 2005). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007). And a court "may rely on government affidavits that show with reasonable specificity why documents withheld pursuant to a valid exemption cannot be further segregated." *Juarez v. DOJ*, 518 F.3d 54, 61 (D.C. Cir. 2008).

Here, the agencies conducted a careful, line-by-line review of each document and withheld information only after they concluded that there was no reasonably segregable factual or non-deliberative information responsive to American Oversight's request.  Marquis ¶ 23; Walsh Decl. ¶ 23.  And for the only document withheld in full—the draft letter to the President—the Court need not reach the issue of segregability because the presidential communications privilege "applies to documents in their entirety[.]"  *Ctr. for Effective Gov't*, 7 F. Supp. 3d at 22.  In any event, OMB has independently determined that there is no reasonably segregable factual or non-deliberative information contained in that letter.  Walsh Decl. ¶ 23.

There are thus no facts rebutting the presumption that the agencies complied with their segregability obligations, and the agencies are entitled to summary judgment on that issue.

## CONCLUSION

For all the foregoing reasons, Defendants respectfully request that this Court grant their motion for summary judgment.

Dated:   April 9, 2018

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ Michael H. Baer*
MICHAEL H. BAER
Trial Attorney (New York Bar No. 5384300)
U.S. Department of Justice,
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW
Washington, D.C. 20530
Telephone:        (202) 305-8573
Facsimile:  (202) 616-8460
E-mail:       Michael.H.Baer@usdoj.gov

*Counsel for Defendants*