**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 17-cv-1448 (ABJ) |
| | ) | |
| U.S. DEPARTMENT OF HEALTH AND | ) | |
| HUMAN SERVICES et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT..........................................................................................................................3

    I.      Legal Standards ...................................................................................................4

    II.     Defendants Improperly Redacted Responsive, Non-Exempt Information from
             Responsive Records. ...........................................................................................5

           A.     The Redacted Material Is Itself Responsive to Plaintiff's FOIA
                  Requests. ..................................................................................................5

           B.     Defendants Improperly Redacted "Non-Responsive" Information from
                  Within Responsive Records..................................................................13

    III.    Exemption 5 Does Not Protect Communications Between Agencies and
             Congress. ...........................................................................................................18

           A.     Communications Between Congress and the Defendant Agencies Are
                  Not "Inter-Agency" or "Intra-Agency" Communications.......................18

                1.     The Plain Text of Exemption 5 and the Supreme Court's
                      Interpretation of that Text Preclude Defendants' Position Here. ...18

                2.     The "Consultant Corollary" Does Not Apply to Inter-Branch
                      Communications About Potential Regulatory Actions.................20

                      a.     Congress Was Not Providing Neutral Expert Advice, but
                          Rather Was Representing Its Own Interests. .........................22

                      b.     The Redacted Communications Were Not Solicited by the
                          Agencies Through Any Formal or Informal Consultancy
                          Arrangement........................................................................26

                      c.     The Available Information About the Records Belies the
                          Agencies' Claim that Congress Was Acting as a Consultant
                          Advising the Agencies on Internal Deliberations. .................28

                      d.     The Cases on Which Defendants Rely Do Not Support
                          Their Position....................................................................29

                3.     Defendants' Position Rests on a Fundamental Misunderstanding
                      of Our Constitutional Scheme. ....................................................35

4.      Adopting Defendants' Position Would Have Wide-Ranging, Deleterious Consequences at Odds with FOIA's Animating Purpose....................................................................................37

B.      Defendants Have Not Established that the Material Redacted Under Exemption 5 Is Protected by the Deliberative Process Privilege..............38

CONCLUSION.....................................................................................................................41

## **TABLE OF AUTHORITIES**

### **CASES**

*Am. Immigration Lawyers' Ass'n v. Exec. Office for Immigration Rev.*,
  830 F.3d 667 (D.C. Cir. 2016) .................................................................... 4, 15, 18

*Am. Oversight v. GSA*,
  Mem. Op., No. 17-1267 (D.D.C. May 3, 2018) ....................................... 12, 13, 16

*Assassination Archives & Res. Ctr. v. CIA*,
  334 F.3d 55 (D.C. Cir. 2003) ................................................................................. 4

*Beck v. DOJ*,
  997 F.2d 1489 (D.C. Cir. 1993) ............................................................................. 4

*Bigwood v. U.S. Agency for Int'l Dev.*,
  484 F. Supp. 2d 68 (D.D.C. 2007) ......................................................................... 4

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ............................................................................................. 36

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ................................................................................................. 35

*Citizens Progressive Alliance v. Bureau of Indian Affairs*,
  241 F. Supp. 2d 1342 (D.N.M. 2002) ................................................................... 23

*Coffey v. Bureau of Land Mgmt.*,
  277 F. Supp. 3d 1 (D.D.C. 2017) ................................................................... 12, 16

*Conn. Nat'l Bank v. Germain*,
  503 U.S. 249 (1992) ....................................................................................... 18, 20

*Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*,
  447 U.S. 102 (1980) ............................................................................................. 18

*CREW v. DHS*,
  514 F. Supp. 2d 36 (D.D.C. 2007) ....................................................................... 23

*Ctr. for Int'l Envtl. Law v. U.S. Trade Rep.*,
  237 F. Supp. 2d 17 (D.D.C. 2002) ....................................................................... 22

*DOI v. Klamath Water Users Protective Ass'n*,
  532 U.S. 1 (2001) .......................................................................................... passim

*DOJ v. Reporters' Comm. for Freedom of the Press*,
 489 U.S. 749 (1989) ........................................................................................ 38

*Dow Jones & Co. v. DOJ*,
 917 F.2d 571 (D.C. Cir. 1990) ......................................................................... 20

*FBI v. Abramson*,
 456 U.S. 615 (1982) .......................................................................................... 4

*Formaldehyde Institute v. HHS*,
 889 F.2d 1118 (D.C. Cir. 1989) ....................................................................... 32

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*,
 561 U.S. 477 (2010) ......................................................................................... 35

*Georgacarakos v. FBI*,
 908 F. Supp. 2d 176 (D.D.C. 2012) ................................................................... 4

*Gov't Land Bank v. GSA*,
 671 F.2d 663 (1st Cir. 1982) ............................................................................ 23

*Hallstrom v. Tillamook Cty.*,
 493 U.S. 20 (1989) ........................................................................................... 20

*Hoover v. DOI*,
 611 F.2d 1132 (5th Cir. 1980) ......................................................................... 23

*Jordan v. DOJ*,
 591 F.2d 753 (D.C. Cir. 1978) ..................................................................... 38, 39

*Judicial Watch v. DOE*,
 412 F.3d 125 (D.C. Cir. 2005) ......................................................................... 33

*Judicial Watch v. DOT*,
 950 F. Supp. 2d 213 (D.D.C. 2013) ................................................................. 34

*Judicial Watch v. Reno*,
 154 F. Supp. 2d 17 (D.D.C. 2001) ................................................................... 39

*Larson v. Dep't of State*,
 565 F.3d 857 (D.C. Cir. 2009) ......................................................................... 40

*Lead Indus. Ass'n v. OSHA*,
 610 F.2d 70 (2d Cir. 1979) .............................................................................. 23

*Loving v. United States,*
  517 U.S. 748 (1996) ............................................................................................36

*Lucaj v. FBI,*
  852 F.3d 541 (6th Cir. 2017) ........................................................................ 20, 21

*McKinley v. Bd. of Governors of Fed. Reserve Sys.,*
  647 F.3d 331 (D.C. Cir. 2011) ...........................................................................33

*Miller v. DOJ,*
  562 F. Supp. 2d 83 (D.D.C. 2008) .....................................................................23

*Milner v. Dep't of the Navy,*
  562 U.S. 562 (2011) ............................................................................................4

*Nat'l Inst. of Military Justice v. DOD,*
  512 F.3d 677 (D.C. Cir. 2008) ....................................................................passim

*Nat'l Inst. of Military Justice v. DOD,*
  No. 06-5242, 2008 WL 1990366 (D.C. Cir. Apr. 30, 2008) ................................21

*Nation Magazine, Wash. Bureau v. U.S. Customs Serv.,*
  71 F.3d 885 (D.C. Cir. 1995) ....................................................................... 13, 16

*NLRB v. Robbins Tire & Rubber Co.,*
  437 U.S. 214 (1978) ...........................................................................................38

*NRDC v. Nuclear Regulatory Comm'n,*
  216 F.3d 1180 (D.C. Cir. 2000) .........................................................................38

*Parker v. DOJ,*
  278 F. Supp. 3d 446 (D.D.C. 2017) .............................................................. 12, 16

*PETA v. NIH,*
  745 F.3d 535 (D.C. Cir. 2014) ...........................................................................13

*Public Citizen v. DOJ,*
  111 F.3d 168 (D.C. Cir. 1997) ...........................................................................32

*Ryan v. DOJ,*
  617 F.2d 781 (D.C. Cir. 1980) ........................................................... 21, 26, 29, 30

*Sakamoto v. EPA,*
  443 F. Supp. 2d 1182 (N.D. Cal. 2006) ..............................................................23

*Shapiro v. CIA*,
   247 F. Supp. 3d 53 (D.D.C. 2017) ............................................................... 15, 16, 17

*Soucie v. David*,
   448 F.2d 1067 (D.C. Cir. 1971) ........................................................................... 21

*United States v. Weber Aircraft Corp.*,
   465 U.S. 792 (1984) ............................................................................................ 19

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ...................................................................... 38, 39

*Wu v. Nat'l Endowment for the Humanities*,
   460 F.2d 1030 (5th Cir. 1972) ............................................................................. 23

## **STATUES**

5 U.S.C. § 551(1)(A) ................................................................................................. 19

5 U.S.C. § 552(a)(3)(D) ............................................................................................. 6

5 U.S.C. § 552(a)(4)(B) ......................................................................................... 4, 38

5 U.S.C. § 552(b)(1)–(9) ........................................................................................... 6

5 U.S.C. § 552(b)(5) ....................................................................................... 1, 18, 19

## **OTHER AUTHORITIES**

Dep't of Justice Guide to the Freedom of Information Act, Exemption 5
   (May 7, 2014) ............................................................................................... 22, 27

*OIP Guidance: Defining a "Record" Under the FOIA*, Dep't of Justice,
   (updated Feb. 15, 2017) ...................................................................................... 15

Freedom of Information Act, Mem. for the Heads of Exec. Dep'ts and Agencies,
   74 Fed. Reg. 4683 (Jan. 21, 2009) ..................................................................... 17

The Federalist No. 51 (J. Madison) .................................................................... 35, 36

## **RULES**

Fed. R. Civ. P. 56(a) .................................................................................................. 4

## CONSTITUTIONAL PROVISIONS

U.S. CONST. art. I, § 6, cl. 2 ...................................................................................................36

# INTRODUCTION

Defendants the U.S. Department of Health and Human Services (HHS) and the Office of Management and Budget (OMB) have gone to extraordinary lengths to withhold information responsive to Plaintiff's Freedom of Information Act (FOIA) requests. First, they have narrowly construed Plaintiff's requests as a pretext for redacting as "non-responsive" portions of responsive outgoing emails that contain the content of previous emails in the chain and provide necessary context for the produced material. And even more concerning, they have advanced the novel claim that their communications with Congress are exempt from disclosure under FOIA because those communications are "inter-agency or intra-agency" deliberative materials. *See* 5 U.S.C. § 552(b)(5) (Exemption 5). Notwithstanding the fact that Congress is decidedly not an "agency" for purposes of FOIA, Defendants argue that these external communications relating to potential health care regulatory actions are exempt from FOIA because Congress was purportedly part of the agency for the purposes of these agency decisionmaking processes. *See* Mem. of Points and Auth. in Supp. of Defs.' Mot. for Summary Judgment at 21–27, ECF No. 14-1 ("Defs.' Br."). That argument finds no basis in this circuit's FOIA jurisprudence, defies fundamental principles of the separation of powers, and is belied by the unredacted portions of the records. It is simply not plausible that members of Congress and congressional staff were standing in the shoes of executive branch officials and playing a role typically performed by agency employees. Consequently, Defendants' redaction of material based on the claim that it was either "non-responsive" or protected by Exemption 5 was improper, and the redacted material must be disclosed as a matter of law.[1]

---

[1] Plaintiff does not challenge the adequacy of Defendants' searches for responsive records. *See* Defs.' Br. at 5–9. Plaintiff also does not challenge OMB's withholding of a draft letter to the

## BACKGROUND

On May 4, 2017, American Oversight submitted virtually identical FOIA requests to

HHS and OMB, seeking the following records:

> 1. A copy of any letter or memorandum sent on or about March 23, 2017, to Congressional Republicans outlining potential regulatory actions related to the Affordable Care Act. The requested record was referenced in an April 4, 2017 letter from 21 senators to Secretary Tom Price.

> 2. Any other communications from [HHS/OMB] to any member of Congress or congressional staff concerning potential administrative actions relating to implementation of the Affordable Care Act.

Ex. 1 (HHS FOIA request); Ex. 2 (OMB FOIA request). The requests sought all such records

from March 6, 2017, to the date the agencies conducted their searches.

After receiving no response from either agency, American Oversight filed suit on July 20,

2017. Compl., ECF No. 1.  HHS completed its productions on January 29, 2018, and OMB

completed its productions on February 15, 2018. Feb. 16, 2018 Joint Status Report, ECF No. 13.

Both agencies' productions contained two categories of redactions that are impermissible

under the FOIA statute: first, both agencies redacted portions of responsive email

communications by declaring them to be standalone "non-responsive records"; and second, both

agencies relied on Exemption 5—which protects only "inter-agency or intra-agency"

communications—to redact communications shared outside the executive branch, to members of

Congress or their staff. American Oversight challenges both of those categories of redactions.

---

President, *see* Defs.' Br. Part IV.A, although Plaintiff does not agree that the draft letter is properly exempt.

## ARGUMENT

The first issue in this case is a straightforward one: what constitutes a "responsive" communication from Defendants to Congress? Plaintiff's FOIA requests sought all communications *from* the agencies *to* Congress relating to potential health care regulatory actions. The produced records here reflect that, when the HHS or OMB staffers sent the emails at issue to Congress, they opted to include the preceding email exchange as in-line text within those communications. Thus, the responsive outgoing emails contained within them as context an in-line record of the content of the prior emails in the chain. Consequently, the entirety of those communications is responsive, regardless of whether Defendants characterize them as one "record" or multiple "records."

The second issue in this case presents a straightforward question of statutory interpretation: do discussions and negotiations between Congress and the executive branch regarding potential regulatory actions qualify, as Defendants contend, as privileged "inter-agency or intra-agency memorandums or letters" exempt from disclosure under 5 U.S.C. § 552(b)(5)?

Defendants contend that Congress was effectively acting as part and parcel of the defendant agencies, performing a role akin to an agency employee in the agency deliberations and decisionmaking regarding potential administrative actions on health care. *See* Defs.' Br. at 21–27. This argument demeans Congress and its place in our constitutional scheme and ignores important features of the cases on which Defendants rely, which recognize a "consultant corollary" to the "inter-agency or intra-agency" component of Exemption 5. Accepting this

expansive argument would upend decades of FOIA precedent and threaten to allow agencies to conceal every external influence on agency policymaking, however pernicious.[2]

## I.     Legal Standards

FOIA cases "typically and appropriately are decided on motions for summary judgment." *Georgacarakos v. FBI*, 908 F. Supp. 2d 176, 180 (D.D.C. 2012). Summary judgment is appropriate when the record as a whole demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

A district court's review of an agency's withholding of materials as exempt from FOIA is subject to *de novo* review. 5 U.S.C. § 552(a)(4)(B); *see also Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 74 (D.D.C. 2007). The agency "bears the burden of establishing the applicability of the claimed exemption." *Assassination Archives & Res. Ctr. v. CIA*, 334 F.3d 55, 57 (D.C. Cir. 2003); *accord Beck v. DOJ*, 997 F.2d 1489, 1491 (D.C. Cir. 1993) ("Consistent with the purpose of the Act, the burden is on the agency to justify withholding requested documents."). The nine FOIA exemptions are "explicitly made exclusive," and must be "narrowly construed." *Milner v. Dep't of the Navy*, 562 U.S. 562, 565 (2011) (quoting *FBI v. Abramson*, 456 U.S. 615, 630 (1982)). There is "no statutory basis for redacting ostensibly non-responsive information from a record deemed responsive." *Am. Immigration Lawyers' Ass'n v. Exec. Office for Immigration Rev.*, 830 F.3d 667, 670 (D.C. Cir. 2016) (*AILA*).

---

[2] Defendants have advanced many of the same arguments regarding the executive branch's purported use of members of Congress and congressional staff as consultants on agency decisions in the case of *American Oversight v. HHS et al.*, No. 17-827 (D.D.C. filed May 4, 2017), which is currently pending before Judge Emmet Sullivan.

II.     **Defendants Improperly Redacted Responsive, Non-Exempt Information from Responsive Records.**

The records produced by Defendants contain numerous redactions on the grounds that the redacted material is purportedly "non-responsive" to American Oversight's request. These redactions are doubly improper: first, the redacted material is itself responsive to American Oversight's request; and second, the redacted material is, at a minimum, part of a responsive record, and FOIA does not permit redactions within a responsive record based solely on the determination that portions of the record are non-responsive.

A.     **The Redacted Material Is Itself Responsive to Plaintiff's FOIA Requests.**

To begin with, Defendants' determination that the redacted material is "non-responsive" is incorrect. Plaintiff's FOIA requests sought all "communications *from* [HHS/OMB] *to* any member of Congress or congressional staff" regarding potential administrative actions on health care. *See* Exs. 1, 2 (emphasis added). Defendants redacted as "non-responsive" portions of communications sent from agency officials to Congress regarding such actions. Thus the redacted material is responsive to the plain terms of American Oversight's requests.

Defendants attempt to frame this issue as a dispute about the agency's ability to define what constitutes a "record." But this is a mischaracterization that rests on a basic misunderstanding of how email communications occur in practice. Plaintiff's FOIA requests sought all communications *from* the agencies *to* Congress on this particular topic. The produced records here reflect that, when the agency staffers sent the emails at issue to Congress, they opted to include prior email exchanges as in-line text within those communications. That is, when each responsive email was sent from the agencies to Congress, the communication that was conveyed from agency servers to congressional servers contained *as part of* that communication an in-line record of the preceding messages in the chain. Consequently, consistent with the FOIA requests,

the entirety of that communication is responsive, regardless of whether the agency characterizes it as one "record" or multiple "records."

Defendants therefore erred in redacting portions of communications which were plainly responsive to Plaintiff's requests. FOIA requires agencies to produce "those records which are responsive to a [FOIA] request," 5 U.S.C. § 552(a)(3)(D), subject only to nine clearly-defined exemptions, 5 U.S.C. § 552(b)(1)–(9). Here, Defendants have redacted plainly responsive material from responsive records without claiming any exemption, in violation of the law.

Defendants claim that they processed each "email" they reviewed—meaning the content of each separate message that appeared in a thread in the same document—as a distinct "record." *See* Defs.' Br. at 9. After splitting up (at least analytically, if not physically) the documents into multiple "records" in this fashion, the agencies proceeded to deem each "record" that reflected the content of an *incoming* email "non-responsive." *See, e.g.*, Ex. 3 (HHS Excerpts); Ex. 4 (OMB Production). As described below, such an approach to identifying the relevant "record" is likely inappropriate in light of guidance from both DOJ and this Court. *See infra* Part II.B. But regardless of how Defendants defined "record" or whether they are legally entitled to partition a single document into multiple "records" in this fashion, this entire approach overlooks a much more straightforward question: what was actually contained in the responsive communications sent from the agencies to Congress?

The answer to that question—the responsive communications that were sent from the agencies to Congress contained within them the material that the agencies have now severed and treated as discrete, "non-responsive" "records"—makes clear that all of the material redacted as "non-responsive" was, in fact, responsive to the plain terms of Plaintiff's requests. Defendants' approach turns a blind eye to the factual reality of how email communication works.

The produced records make clear that the agency officials who sent the relevant communications to Congress opted to include the content of the preceding email exchanges as in-line text in each new communication. *See* Exs. 3, 4. This was undoubtedly a choice made by the agency officials. Microsoft Outlook,[3] like most email programs, permits users to set their preferences for reply emails and to opt to (1) include the preceding email exchange as in-line text in the reply email; (2) include the preceding email exchange as an attachment to the reply email; or (3) omit the preceding email exchange from the reply email altogether. *See Change How the Original Message Appears in Replies and Forwards*, MICROSOFT, https://bit.ly/2IrXxtw. And even if Outlook had not included the option to set preferences in this fashion, preceding email exchanges can always be deleted before a reply email is sent.

For example, when an individual receives an email and hits "Reply" to that email, the program initiates a new outgoing email from that person to the other individuals on the email chain. If the email program preferences are set to include preceding email exchanges as in-line text, the email program will automatically include within that new draft email a copy of the text of the incoming email being replied to, as seen in the sample screenshots below (using the Apple Mail email program):

Fig. 1: Sample incoming email



---

[3] HHS and OMB's declarants indicate that Defendants used Outlook for their email. *See* Marquis Decl. ¶¶ 15, 17; Walsh Decl. ¶¶ 7, 9.

Fig. 2: View after hitting "Reply," reflecting the original incoming email text in blue



The person sending the email reply then has a number of choices: (1) they can simply type their reply in the text box and send back the full exchange as the content of the email; (2) they can manually delete the text of the incoming email and send back an email containing only their reply; or (3) they can reset the default email program preferences to omit the incoming email text altogether (or to include the incoming email as an attachment) and create a new reply email. The first two alternatives are displayed below:

Fig. 3: Standard Reply



Fig. 4: Reply without incoming text (manually deleted)



In other words, if the sender maintains the email program preferences and chooses not to manually delete the incoming text to which they are responding, the email "reply" in effect constitutes a transcript of the conversation up to that point in time.

There is a very good reason why people often opt to set their email program preferences to include preceding email exchanges as in-line text and decide not to manually delete the preceding email chain, which is clearly reflected in the example above: an email response often implicitly incorporates the previous communication between the participants, and would be much more difficult to decipher without being able to reference the previous communication. Put differently, the context provided by the prior email exchange is an important part of the new communication. In the example above, if Ms. Cafasso received the reply in Fig. 3, she would immediately be reminded of her earlier request to speak with Ms. Creighton, and would understand from Ms. Creighton's response that she was free to meet with Ms. Cafasso later that afternoon. If, on the other hand, Ms. Cafasso received the reply in Fig. 4 and did not immediately recall what the "quick question" was she had asked Ms. Creighton, the simple response "Yes." would be of minimal assistance.

To extend the example, an email user actually has a fourth option when they are responding to an incoming email: rather than use the email program's reply function, they could choose instead to compose a brand new email, untethering their response from the original email. In the examples below, the need to reference back to the original email becomes clear:

Fig. 5: Incomplete reply in new message



Fig. 6: Complete reply in new message



Without the context provided by some reference to what question had been asked, the email response in Fig. 5 is virtually meaningless. It is for this reason that most people choose to simply hit "Reply" and leave in the preceding conversation as part of their response. This underscores the fact that the context provided by the in-line inclusion of the preceding email exchange is an important part of the new, outgoing communication.

Thus, the emails at issue in this case sent from agency employees to Congress necessarily contained within them—that is, *as part of* the communications sent from the agencies to Congress, i.e., the responsive agency records—the content of the incoming email messages from Congress to which they are replying and any earlier back-and-forth in the email chain. In fact, many of the emails produced in this case reveal exactly the type of problem exemplified above: without the context provided by the preceding email message(s), the responsive email produced by the government lacks all meaning. Again, this illustrates the extent to which the agency employees' inclusion of the prior correspondence as in-line text in the new communications was, in fact, an essential part of the new communications.

What follows are excerpts from just a few examples of the many such emails contained within HHS's productions:[4]

- HHS 2017-00722-00012–13 ("Yes, thank you for flagging this for us.");

- HHS 2017-00722-00015 ("Thanks for reaching out.");

- HHS 2017-00722-00016 ("Sure thing.");

- HHS 2017-00722-00019 ("no update to report yet.");

- HHS 2017-00722-00021 ("Great. Talk to you then.");

- HHS 2017-00722-00023 ("Still no update – will keep you posted.");

- HHS 2017-00722-00025 ("Let me check on this for you and circle back.");

- HHS 2017-00722-00035 ("Thanks, Ben. Look forward to seeing you then!");

- HHS 2017-00722-00037 ("Thanks for the heads up, Katie!");

- HHS 2017-00722-00085 ("Ok – will do.");

- HHS 2017-00722-00095 ("Thanks, Jen!");

- HHS 2017-00722-00097 ("Yes, specifics would help! Thank you!!");

- HHS 2017-00722-00100 ("Great stuff . . . very much appreciated").

*See* Ex. 3 (HHS production excerpts). Plainly, the purpose of Plaintiff's FOIA requests was not to obtain such purely un-substantive communications sent from the agencies to Congress. Just as plainly, the context provided by the redacted "non-responsive" portions of these documents formed an important part of these communications.

---

[4] The only record produced by OMB in this case is equally unhelpful, but for dual reasons: the preceding email is indeed redacted in full, leaving no context from which to understand the produced email; in addition, the one substantive line of the produced email is redacted in full under Exemption 5, an equally inappropriate redaction discussed in greater detail in Part III below.

Courts have recognized that attachments to emails that discuss or reference the contents of the attachment should not be viewed as separate communications from their parent email, because the attachment is necessary context to understand the email text. *See, e.g.*, *Coffey v. Bureau of Land Mgmt.*, 277 F. Supp. 3d 1, 8 (D.D.C. 2017) (holding that a request for "all emails" necessarily included attachments to those emails that were referenced or discussed in the responsive emails because the emails made "explicit reference to, or include[d] discussion of, the missing attachments," and thus the attachments "should reasonably be considered part and parcel of the email by which they were sent"); Mem. Op. at 14, *Am. Oversight v. GSA*, No. 17-1267, ECF No. 31 (D.D.C. May 3, 2018) (holding that GSA's exclusion of email attachments from its production was inappropriate where the emails produced to the plaintiff "refer to attachments" and therefore clearly "belong together" with the already-produced emails); *see also Parker v. U.S. Dep't of Justice, Office of Prof'l Responsibility*, 278 F. Supp. 3d 446, 451–52 (D.D.C. 2017) (finding it appropriate to treat letter and its attachment as "one indivisible whole," because the letter "itself touche[d] on the subject matter of the attachment and refer[red] the recipient to examine its contents"). This is all the more true with respect to the content of prior email exchanges included as in-line text in a reply email: as reflected in the examples discussed above, the content of the incoming emails is often referenced or discussed—implicitly, if not explicitly—in the outgoing emails, and provides context essential to making sense of the outgoing communication. Indeed, the examples above make clear that the message of the outgoing email was almost always intended to be read and understood alongside the content of the preceding email messages included therein. Thus, the content of the preceding email exchanges, including the incoming emails from Congress, are undeniably "part and parcel" of

the responsive outgoing communications produced in this case, and should not have been

deemed "non-responsive."[5]

Finally, even if there were any ambiguity on this point, Defendants' "blinkered

literalism," distinguishing incoming from outgoing emails within the same document, "is at odds

with the agency's 'duty to construe a FOIA request liberally.'" *See* Mem. Op. at 14, *Am.*

*Oversight v. GSA*, No. 17-1267, ECF No. 31 (D.D.C. May 3, 2018) (quoting *PETA v. NIH*, 745

F.3d 535, 540 (D.C. Cir. 2014) (quoting *Nation Magazine, Wash. Bureau v. U.S. Customs Serv.*,

71 F.3d 885, 890 (D.C. Cir. 1995))).

**B.    Defendants Improperly Redacted "Non-Responsive" Information from
         Within Responsive Records.**

As discussed above, the material redacted by Defendants was not, in fact, "non-

responsive" to Plaintiff's FOIA requests. However, even assuming that one views the redacted

information as non-responsive, there is no dispute that it was contained within responsive

records, and FOIA does not permit the redaction of material within responsive records based

solely on the determination that it is "non-responsive." *AILA*, 830 F.3d at 678. Defendants have

tried to skirt that requirement by defining the purportedly non-responsive information in these

documents as separate "records." But it is inappropriate for Defendants to define a "record" in

such a way as to exclude relevant contextual information. Defendants' division of emails sent by

---

[5] To be clear, it is not Plaintiff's position that an email message *from* Congress *to* the defendant agencies that includes the content of prior email exchanges would be responsive to Plaintiff's requests as written, except in the unlikely circumstance that it is the only record of the agency's outgoing communications. Thus if the search returned, for example, four separate emails—an initial email from the agency to Congress; a reply email from Congress including the initial email as in-line text; a response from the agency including both preceding emails; and a final reply from Congress including all three prior emails—in Plaintiff's view, only the first and third documents would be responsive communications to Congress, but there would be no basis for redacting the content of Congress's response contained within the body of the third communication based on a responsiveness determination.

agency officials to Congress into multiple "records"—divorcing the content of incoming emails contained in the communications from the content of outgoing emails and then redacting the content of the incoming emails as though they were independent, non-responsive records—flouts the guidance provided by both the courts and DOJ's Office of Information Policy on how to identify a relevant "record" for FOIA purposes. Under that guidance the entirety of each email communication sent from the agencies to Congress, including the prior email exchanges provided as in-line text, is properly viewed as a single "record" under FOIA, and the division of each communication into multiple "records" as a pretext to withhold portions of the communications as "non-responsive" was improper.

Defendants purport to have taken each document containing a responsive email chain, analytically subdivided it into incoming emails and outgoing emails, and deemed the former to be non-responsive because the requests sought only communications from the agencies to Congress.[6] Defendants assert that their approach to defining a responsive record was reasonable in light of recent guidance from DOJ's Office of Information Policy and decisions of this circuit that lay out factors in determining what constitutes a "record." Defs.' Br. at 10–13. But those considerations do not support Defendants' conclusion.

To begin with, the factors that the courts of this circuit have pointed to in recent years relate to how to divide "documents that cover multiple, unrelated topics" into discrete "records."

---

[6] As an initial matter, it is not entirely clear that this is actually what Defendants did. In the declarations submitted by the agencies, it is apparent that when the agencies searched for responsive records, the "hits" returned by the search correlated to email threads, not independent emails. Indeed, in the Walsh declaration, OMB clearly equates "records" and "documents." Ms. Walsh states that OMB reviewed the "approximately 1,900 records identified as potentially responsive" to Plaintiff's request, *see* Walsh Decl. ¶ 11, and later refers to the "more than 1,900 documents that were identified as potentially responsive to Plaintiff's request," *id.* ¶ 12. Thus, at some point in the process, OMB considered a "document"—which might contain the content of several email messages within a particular thread—to be a single "record."

*See AILA*, 830 F.3d at 678; *see also Shapiro v. CIA*, 247 F. Supp. 3d 53, 74 (D.D.C. 2017)

(noting that DOJ has "provided a helpful set of criteria for agencies to take into account when

determining whether it is appropriate to divide [documents that cover multiple, unrelated topics]

into discrete 'records.'" (alteration in original) (citation omitted)); *see OIP Guidance: Defining a*

*"Record" Under the FOIA*, Dep't of Justice, (updated Feb. 15, 2017)

https://www.justice.gov/oip/oip-guidance/defining_a_record_under_the_foia ("*OIP Guidance*")

(discussing considerations when dividing a "multi-subject document into distinct records"). The

documents reviewed by Defendants in this case do not cover "multiple, unrelated topics." So far

as Plaintiff can tell from Defendants' representations, the content of both the incoming and the

outgoing emails contained in each document all relate to the agencies' potential regulatory

actions in the area of health care. In other words, Defendants should not have been parsing these

records in the first place.

Thus, nothing in OIP's guidance about how to divide multi-subject documents supports—

or even applies to—Defendants' treatment of the emails in this case. But regardless, the factors

courts have laid out for the division of such multi-subject documents only demonstrate the

inappropriateness of dividing these particular email chains into separate records:

*First*, as discussed above, by splicing out the content of the incoming email messages

contained in these communications, Defendants have failed to "maintain[] the integrity of the

released documents." *Shapiro*, 247 F. Supp. 3d at 75. Without the content of the incoming emails

to which the agencies were responding, most if not all of the records produced by the agencies in

this case are nonsensical. Plainly, no FOIA requester would seek only the incomplete

information that an agency "will do," without knowing what it is they have agreed to do. As

discussed above, the context provided by the content of the preceding email exchanges contained

15

within the communications were an important part of the new, outgoing communications themselves. *See supra* Part II.A.

Consequently, the division of each communication into multiple "records" contravenes the guidance courts have provided that, in determining what constitutes a "record" for FOIA purposes, agencies should not impair the internal coherence of the document. In this way, the content of the incoming email messages contained in the responsive communications but redacted by Defendants is much like attachments, which have often been held to be part and parcel of the emails or letters to which they were attached, such that an agency cannot properly draw a "responsiveness" line between the two. *See supra* Part II.A (citing *Coffey*, 277 F. Supp. 3d 1; *Parker*, 278 F. Supp. 3d 446; Mem. Op., *Am. Oversight v. GSA*, No. 17-1267, ECF No. 31 (D.D.C. May 3, 2018)). Here, of course, the content of each additional message in the chain is informed by the context of the prior emails, and necessarily touches on the subject matter of the earlier emails contained in the chain. Indeed, the incoming emails are contained in the communications themselves, rather than being attached, and so are even more clearly part of the same "record."

*Second*, and relatedly, this parsing of agency records to produce as little as possible in response to a FOIA request risks seriously harming the "public's trust in transparency." *Shapiro*, 247 F. Supp. 3d at 75. The D.C. Circuit has held that agencies have "a duty to construe a FOIA request liberally." *PETA*, 745 F.3d at 540 (quoting *Nation Magazine*, 71 F.3d at 890). By releasing records so heavily redacted that no member of the public could possibly decipher their substantive meaning, Defendants have responded to Plaintiff's FOIA requests in a manner that thoroughly obfuscates the meaning of the records produced. Rather than adhering to the "presumption of disclosure" as required, the government's redactions reveal its intent to obstruct

Plaintiff's effort to learn more about the activities of the executive branch. *See, e.g.*, Freedom of Information Act, Mem. for the Heads of Exec. Dep'ts and Agencies, 74 Fed. Reg. 4683 (Jan. 21, 2009) ("The Freedom of Information Act should be administered with a clear presumption: In the face of doubt, openness prevails."). Productions like this one undoubtedly harm the public's trust in government transparency.

*Third,* the agencies have the best knowledge about the "storage and maintenance of [email] documents" on their servers, *Shapiro*, 247 F. Supp. 3d at 75, and no doubt are familiar with the operation of the Outlook email program discussed above. Knowing that agency employees have the option to exclude preceding emails from their outbound text (whether through their settings or by manually deleting preceding text), but apparently chose not to do so in the email chains at issue here, the agencies should have understood that the full content of each email chain was in fact part of the outgoing emails and was therefore responsive to Plaintiff's FOIA requests. Put another way, Defendants cannot now treat messages within email chains as distinct records for FOIA purposes after their employees opted to treat them holistically when generated as agency records.

For all of these reasons, it was inappropriate for Defendants to define a "record" as being only the portions of responsive documents that reflect outgoing emails, and redact incoming emails as independent, non-responsive records. It is simply not defensible for an agency to conclude that certain text contained within a responsive outgoing email is a standalone "record" that can be withheld as non-responsive.

And as this circuit has clearly established, once it is understood that the entirety of an outgoing email—including the content of preceding email messages contained therein— constitutes a single "record," Defendants may not redact "non-responsive" material contained

within those responsive records. *See AILA*, 830 F.3d at 678 ("[O]nce an agency itself identifies a particular document or collection of material—such as a chain of emails—as a responsive 'record,' the only information the agency may redact from that record is that falling within one of the statutory exemptions."). Accordingly, FOIA does not support the agencies' use of "non-responsive" redactions in these productions.

* * * * * * *

Because Defendants inappropriately redacted portions of responsive records without the support of any of the nine statutory FOIA exemptions, this Court should direct Defendants to reproduce the responsive records without the improper "non-responsive record" redactions.

**III.    Exemption 5 Does Not Protect Communications Between Agencies and Congress.**

Defendants improperly redacted communications between agency personnel and Congress under Exemption 5, which provides that an agency may withhold "inter-agency or intra-agency memorandums or letters that would not be available by law to a party other than an agency in litigation with the agency . . . ." 5 U.S.C. § 552(b)(5). The communications between Congress and the executive branch at issue here plainly fail to satisfy Exemption 5's threshold requirement that the records be "inter-agency or intra-agency," and Defendants have failed to meet their burden of demonstrating that these communications are deliberative in nature.

**A.    Communications Between Congress and the Defendant Agencies Are Not "Inter-Agency" or "Intra-Agency" Communications.**

***1.    The Plain Text of Exemption 5 and the Supreme Court's Interpretation of that Text Preclude Defendants' Position Here.***

Any examination of a statutory exemption must begin with the text of the statute itself. *See, e.g.*, *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108 (1980); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). The plain text of Exemption 5

18

applies only to "inter-*agency* or intra-*agency*" records. 5 U.S.C. § 552(b)(5) (emphasis added).

Elsewhere, the statute itself explicitly excludes Congress from the definition of the term

"agency." *See* 5 U.S.C. § 551(1)(A) (defining "agency" as "each authority of the Government of

the United States, . . . but *does not include . . . the Congress*" (emphasis added)). Thus the plain

terms of the statute make clear that communications between an agency and Congress do not

qualify under Exemption 5 because they cannot, by definition, be "inter- or intra-agency"

communications.

The Supreme Court has emphasized the importance of Exemption 5's threshold

requirement that records be "inter- or intra-agency." In *DOI v. Klamath Water Users Protective

Ass'n*, 532 U.S. 1 (2001), the Court explained that "the first condition of Exemption 5 is no less

important than the second; the communication must be 'inter-agency or intra-agency.'" *Id.* at 9.

"Statutory definitions underscore the apparent plainness of the text," the Court added. *Id.*

Although the Court acknowledged (with evident skepticism) the line of cases on which the

government now relies (discussed below), it stressed that "there is . . . no textual justification for

draining the first condition of independent vitality." *Id.* at 12; *see also United States v. Weber

Aircraft Corp.*, 465 U.S. 792, 802 (1984) (noting that "compelling evidence of congressional

intent . . . would be necessary to persuade us to look beyond the plain statutory language of

[Exemption 5]").

Circuit courts have similarly focused on Exemption 5's textual requirement that the

communications at issue be "inter-agency or intra-agency." In *Dow Jones & Co. v. DOJ*, the

D.C. Circuit rejected the government's argument that the word "inter-agency" should be read to

include inter-*branch* communications, reasoning that "[i]t may well be true that if Congress had

thought about this question, the Exemption would have been drafted more broadly to include

Executive Branch communications to Congress . . . But Congress did not, and the words simply will not stretch to cover this situation." 917 F.2d 571, 574 (D.C. Cir. 1990). Reviewing the statutory definition of "agency," the D.C. Circuit continued, "Congress is simply not an agency," and thus Exemption could 5 could not protect a letter sent from DOJ to Congress. *Id.* The Sixth Circuit similarly relied on the plain text of Exemption 5 and FOIA's definition of "agency" to conclude that communications between DOJ and a foreign law enforcement entity were not "inter-agency or intra-agency" communications. *See Lucaj v. FBI*, 852 F.3d 541, 546 (6th Cir. 2017) (holding that for Exemption 5 to apply, not only must a government agency be the source of a document, but "the destination of the document must be a Government agency as well").

This clear precedent establishes that the communications at issue here are not "inter-agency or intra-agency" records. This threshold incompatibility with the statutory text provides a sufficient basis for the Court to reject Defendants' Exemption 5 claims. *See Conn. Nat'l Bank*, 503 U.S. at 254 ("[W]hen the words of a statute are unambiguous, then, this first canon is also the last: judicial inquiry is complete.") (citation omitted); *Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 28 (1989) (stating that "absent a clearly expressed legislative intention to the contrary, the words of the statute are conclusive") (citation omitted).

### 2. *The "Consultant Corollary" Does Not Apply to Inter-Branch Communications About Potential Regulatory Actions.*

To avoid the straightforward consequence of Exemption 5's plain language, Defendants attempt to rely on a line of circuit court cases that have expanded Exemption 5 to encompass communications with individuals outside the executive branch in certain narrow and limited circumstances not present here. Perhaps recognizing the implicit weakness in their case, Defendants studiously avoid naming the doctrine on which they rely; unsurprisingly, the so-

called "consultant corollary" was not designed for—and cannot be extended to—the type of inter-branch communications at issue here.

The "consultant corollary" arose from a view that federal agencies may at times have "a special need for the opinions and recommendations of temporary consultants," *Soucie v. David*, 448 F.2d 1067, 1078 n.44 (D.C. Cir. 1971), and out of a desire to "ensur[e] that persons [acting] in an advisory role would be able to express their opinions freely to agency decisionmakers without fear of publicity." *Ryan v. DOJ*, 617 F.2d 781, 789 (D.C. Cir. 1980). Thus, courts have at times extended the protections of Exemption 5 to outside consultants advising agencies on their internal deliberations. But Defendants' effort to refashion Congress here as equivalent to that type of retained outside consultant fails.

In *Klamath*, the Supreme Court expressed skepticism about the validity of the "consultant corollary" line of cases, given its tension with the plain language of Exemption 5. *See Klamath*, 532 U.S. at 12 (assuming, but not deciding, that consultants' reports "*may* qualify" as intra-agency communications under Exemption 5 (emphasis added)); *id.* at 12 n.4 ("We need not decide whether either instance should be recognized as intra-agency, *even if* communications with paid consultants are ultimately so treated." (emphasis added)). The Sixth Circuit has held that the corollary did not survive *Klamath*, *see Lucaj*, 852 F.3d at 549 (holding that extending Exemption 5 to communications sent or received outside the government cannot be reconciled with *Klamath*), and at least one judge in this circuit has raised questions about the scope of the corollary after *Klamath*, *see Nat'l Inst. of Military Justice v. DOD*, No. 06-5242, 2008 WL 1990366, at *1 (D.C. Cir. Apr. 30, 2008) (*NIMJ*) (Tatel, J., dissenting from denial of rehearing en banc) ("It is precisely this same first step that this court's decisions skip, permitting agencies to place the 'intra-agency' label on any advice that they solicit in aid of the deliberative process.

21

As the *Klamath* Court admonished, however, '[t]here is no textual justification for draining the first conditions of independent vitality.'" (quoting *Klamath*, 532 U.S. at 12)).

But even assuming the continued vitality of the consultant corollary post-*Klamath*, the corollary does not extend to the types of communications at issue here, for several reasons discussed below.

>    a.    ***Congress Was Not Providing Neutral Expert Advice, but Rather Was Representing Its Own Interests.***

The consultant corollary applies to situations where outside consultants "effectively function[] as agency employees, providing the agencies with advice similar to what [they] might have received from an employee." Dep't of Justice Guide to the Freedom of Information Act, Exemption 5 at 5 n.27 (May 7, 2014) ("DOJ FOIA Manual") (citing *Klamath*, 532 U.S. at 10). In other words, the consultant must be disinterested and provide neutral expert advice, rather than representing an interest of its own or of a client. *See Klamath*, 532 U.S. at 10–11 (observing that what "is constant in the typical cases is that the consultant does not represent an interest of its own, or the interest of any other client, when it advises the agency that hires it"); *Ctr. for Int'l Envtl. Law v. U.S. Trade Rep.*, 237 F. Supp. 2d 17, 27 (D.D.C. 2002) (finding the "degree of self-interest" pursued by the outside party, "as compared to its interest in providing neutral advice," was a "critical factor"). As the Supreme Court has explained, to stand in the shoes of an agency employee, the consultant's only obligations should be "to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Klamath*, 532 U.S. at 10–11. Unsurprisingly, then, the corollary has typically been applied to outside contractors—such as a property appraiser, an English barrister, or an

auditor—who are formally hired by an agency to provide a discrete service based on the consultant's unique expertise.[7]

That is a far cry from the situation here. The redacted communications in this case relate to potential regulatory actions the Trump administration was considering relating to health care. *See, e.g.*, Defs.' Br. at 2; Arbes Decl. ¶ 5; Walsh Decl. ¶ 20; Marquis Decl. Ex. 6 (HHS *Vaughn* Index). The Trump administration—that is, the defendant agencies in this case—are the experts on regulatory actions affecting the health care system. It is disingenuous to suggest that the agencies needed to consult with Congress as an expert about the agencies' own rulemaking agenda. That the agencies chose to discuss their plans with Congress, or wanted information from Congress about what health care reform legislation might be under consideration and how it might affect their plans, does not somehow render Congress an outside consultant on agency decisionmaking regarding HHS regulations. To the contrary, such a suggestion is fundamentally incompatible with the constitutional scheme of the separation of powers established by our founding fathers. *See infra* Part III.A.3.

Indeed, federal agencies often solicit input from outside groups in enacting new rules and regulations to evaluate proposed regulations; the mere fact that an agency uses such information

---

[7] *See, e.g.*, *Hoover v. DOI*, 611 F.2d 1132, 1138 (5th Cir. 1980) (protecting appraiser's report solicited by the agency); *Gov't Land Bank v. GSA*, 671 F.2d 663, 665 (1st Cir. 1982) (same); *Lead Indus. Ass'n v. OSHA*, 610 F.2d 70, 83 (2d Cir. 1979) (protecting consultant's report on safe levels of workplace lead exposure); *Miller v. DOJ*, 562 F. Supp. 2d 83, 113 (D.D.C. 2008) (protecting formal legal opinion for agency prepared by English barrister on English law); *CREW v. DHS*, 514 F. Supp. 2d 36, 44 (D.D.C. 2007) (protecting documents prepared by FEMA contractors); *Sakamoto v. EPA*, 443 F. Supp. 2d 1182, 1191 (N.D. Cal. 2006) (protecting documents prepared by contractor hired to audit agency); *Citizens Progressive Alliance v. Bureau of Indian Affairs*, 241 F. Supp. 2d 1342, 1355 (D.N.M. 2002) (protecting recommendations by private company hired by the agency); *NIMJ*, 512 F.3d at 681 (protecting advice solicited by the Army from legal experts concerning military commission regulations); *Wu v. Nat'l Endowment for the Humanities*, 460 F.2d 1030, 1032 (5th Cir. 1972) (protecting recommendations of Chinese historians who agreed to act as volunteer consultants).

in its internal decisionmaking process does not render all of those communications "intra-agency." If it did, every communication with a lobbyist for a regulated entity weighing in on the necessity or likely impact of a proposed rule on their industry, and every communication with think tanks, public interest groups, trade groupds, and advocacy organizations pushing their own policy agendas, could be considered an "intra-agency" communication, which plainly is not the case. *See infra* Part III.A.4.

Moreover, just like a lobbyist conferring with an agency about the impact of a potential regulatory action on its own industry, the members of Congress and congressional staff involved in the communications here undoubtedly were acting in the interest of Congress, themselves, and/or their constituencies. Their "only obligation" was not "to truth and [their] sense of what good judgment calls for," *Klamath*, 532 U.S. at 10–11, nor were they acting "just as an employee [of the agencies] would be expected to do," *id.* Rather, they were undoubtedly working to secure their preferred outcome for the national health care system, the interests of their constituents, or their own political interests. The mere fact that the two branches were controlled by the same political party whose ultimate policy goals potentially might have been aligned at some very high level of generality does not change this analysis; such a result would lead to shifting application of FOIA law depending on the political parties in power, and even depending upon the differing views within one party's caucus, an untenable standard.

Defendants attempt to avoid this logical reading of decades of "consultant corollary" case law by advancing the narrowest possible view of *Klamath*, contending that *Klamath* only forecloses the use of the corollary in situations where the non-agency entity is a "'self-advocate[]' seeking a particular government benefit 'at the expense of others.'" Defs.' Br. at 25 (quoting *Klamath*, 532 U.S. at 12). Defendants then go on to narrow *Klamath* even further,

suggesting (without citation), that any communications with an outside entity can be considered "intra-agency" so long as the non-agency entity is not "itself the subject of the decision the agency is contemplating." Defs.' Br. at 26. That reading of *Klamath* not only finds no support in *Klamath*'s text, but also cannot be squared with the Supreme Court's reasoning in the case. Defendants' reading ignores the central thrust of *Klamath*: namely, that the requirement that the communications at issue be "inter-agency or intra-agency" is an independent and textually-mandated condition that must be present in order to apply Exemption 5, and that any effort to extend Exemption 5 to communications that include parties outside the executive branch must explain how such communications nevertheless meet this mandatory textual prerequisite. Thus the *Klamath* Court only skeptically acknowledged that "consultants *may* be enough like the agency's own personnel to justify calling their communications 'intra-agency'" in the "typical" case where the outside entities are not in communication "with the government in their own interest or on behalf of any person or group." 532 U.S. at 12 (emphasis added). Here, however, the congressional participants simply are not "enough like the agency's own personnel to justify calling their communications 'intra-agency.'"

And regardless, even if the standard advanced by the Defendants applied, the members of Congress and staff with whom the agencies communicated were undoubtedly "self-advocates at the expenses of others seeking benefits inadequate to satisfy everyone." *Id.* Individual members of Congress (and the staffers who work on their behalf) each have their own political interests in how proposed regulations would alter the health care landscape. Each has their own personal, political, and policy interests. And each represents the varying interests of their respective constituencies, and different permutations of proposed regulations may have different impacts on those constituencies depending on the composition of the district. For example, a representative

from a state that had expanded Medicaid under the ACA would have dramatically different

interests than a representative from a state that had not, regardless of party. And because federal

funding is a finite resource, an approach that benefits one representative's state or district often

disadvantages other states or districts. In short, each congressional participant in these

communications had unique interests that were likely at odds with the interests of other

participants, and the outcome of the agencies' decisionmaking regarding what administrative

actions to take on health care will invariably have impacts that affect the interests of the

congressional participants and their constituents, some positively and some negatively. Finally, it

is Defendants' burden to establish with facts (and not just blithe assertions) that each individual

congressional participant in these emails *independently* satisfied the requirements of the

consultant corollary, even under their stretched view of that doctrine. As they have offered only

generic assertions that run counter to logic and lived experience, they have not met this burden.

Accordingly, even under Defendants' constrained reading of *Klamath*, it would be inappropriate

to extend the "consultant corollary" to the communications here.

> **b.        *The Redacted Communications Were Not Solicited by the Agencies Through Any Formal or Informal Consultancy Arrangement.***

In further keeping with the traditional use of the consultant corollary, in order for a

communication with an outside entity to be considered "intra-agency," it must have been

solicited by the agency. *See, e.g.*, *Ryan*, 617 F.2d at 795 (extending "intra-agency" requirement

to records submitted by outside consultants where they were "solicited by that agency"); *Nat'l*

*Inst. of Military Justice v. DOD*, 512 F.3d 677, 680 (D.C. Cir. 2008) (*NIMJ*) (finding important

the fact that the agency formally solicited the outside advice). And, as an obvious corollary to

that requirement, the outside consultant must have understood itself to be acting as a consultant

to agency deliberations through some formal or informal arrangement. *See NIMJ*, 512 F.3d at 686 (finding that "consultant corollary" cases have all reflected "indicia of a consultant relationship between the outsider and the agency"); *see also generally* DOJ FOIA Manual, Exemption 5 at 4 n.22 (May 7, 2014),

https://www.justice.gov/sites/default/files/oip/legacy/2014/07/23/exemption5.pdf (collecting cases involving contracts with outside consultants); *id.* at 4–5 n.23 (collecting cases involving volunteer consulting arrangements with agencies); *id.* n. 24 (collecting cases involving other official capacity interactions).

Here, several of the redacted communications appear to have been initiated by Congress, as evidenced by the fact that the contents of the first email in the chain are redacted as a "non-responsive record" and thus presumably contain emails from Congress to the agency. *See* Defs.' Br. Part III (explaining the basis for the non-responsive record redactions); *see also* Ex. 3 at HHS 2017-00722-00078, HHS 2017-00722-00116; Ex. 4 at OMB074FY17204_000000501. Plainly, these communications do not reflect a situation where the agencies sought input from a neutral third party, as contemplated by the consultant corollary.

And there are simply no indicia of any consulting relationship between Congress and the agencies; there is no evidence that the congressional staff involved in these communications understood themselves to be acting as outside advisors to the agencies, rather than on behalf of their principals (or Congress itself) to advance their own political and policy interests.

> ***c.*** **The Available Information About the Records Belies the Agencies' Claim that Congress Was Acting as a Consultant Advising the Agencies on Internal Deliberations.**

A close review of the unredacted portions of the documents produced in this case further reveals that these communications do not reflect the neutral advice of an outside consultant assisting the agency in its own deliberative process. For example:

- In one redaction, an HHS employee provides a "status update" to several Senate staff members, with no request for a response or input from Congress. *See* Ex. 3 at HHS 2017-00722-00078.

- In one exchange, HHS employees appear to be arranging a meeting with congressional staffers, and one email in the chain references "papers [HHS] will want to pass out"—presumably to members of Congress or their staff—at the meeting. *See* Ex. 3 at HHS 2017-00722-00104-06, -107-09, -110-12.

- In another exchange, an HHS employee emails a member of Senator Ron Johnson's staff to pass along information from CCIIO [the Center for Consumer Information and Insurance Oversight at HHS]. *See* Ex. 3 at HHS 2017-00722-00116.

In each of these instances, the agency is providing information *to Congress*, and there is no indication that Congress is providing any advice to HHS whatsoever, much less the type of disinterested, expert advice contemplated by the consultant corollary.

The *Vaughn* index entries for HHS's redactions further reveal that they cannot properly be considered "intra-agency" materials that formed part of an internal agency deliberation:

- Several entries assert that revealing the redacted communications would compromise "the agency's strategy for engaging with Congress about regulatory actions." *See* Marquis Decl. Ex. 6 (*Vaughn* index entries for HHS 2017-00722-00102, -103, -107-09, -110-12, -113, -114). But the communications themselves must constitute the execution of that strategy—as they themselves constitute steps the agency has taken to engage with Congress about these issues—and so cannot plausibly be considered "predecisional" or "deliberative." *See infra* Part III.B. In any event, this description highlights the fact that these communications were not part of an effort to solicit input from a consultant on an internal agency decision.

- Another entry states that release of the redacted material "would compromise the agency's deliberative process in considering and adjusting technical assistance."

*See* Marquis Decl. Ex. 6 (*Vaughn* Index entry for HHS 2017-00722-00116). Technical assistance is information provided to Congress to assist Congress in drafting legislation. By definition, then, agency provision of technical assistance to Congress is never an "intra-agency" communication and never constitutes internal agency deliberations about *agency* (as opposed to congressional) decisionmaking. While a purely internal agency discussion about *what* technical assistance to provide to Congress might properly be subject to Exemption 5, the communication of any such information *to Congress*—as was true here—defeats any claim of Exemption 5.

- Several entries state that the withheld material constitutes a discussion of "the potential attendance of former Secretary Price at a planned conference with members of Congress, and the subject matter of the planned conference." *Id.* (*Vaughn* Index entry for HHS 2017-00722-0079, -102, -103, -104-05, -108-09, -111-12, -113, -114). But nothing about planning a conference would appear to reveal input from Congress on any internal agency decision.

In short, although the heavily-redacted nature of the records makes it difficult to tell what information was actually being exchanged in these communications, all available indications suggest that the communications amount to nothing more than HHS sharing with Congress—an entity plainly outside the executive branch—the current state of its plans for regulatory actions relating to health care reform, and perhaps (though not clearly) engaging Congress about the interplay between those potential regulatory actions and potential legislative actions Congress was then considering. That is simply no different than an agency communicating with a state government, a regulated entity, a lobbyist or trade organization, or any other person or group with an interest in potential regulatory actions—none of which would properly be considered "intra-agency" communications under Exemption 5.

### d.     The Cases on Which Defendants Rely Do Not Support Their Position.

Defendants have only pointed to one case where communications between an agency and Congress were found to be "intra-agency" communications under the consultant corollary: *Ryan v. DOJ*, 617 F.2d 781 (D.C. Cir. 1980). *See* Defs.' Br. at 22–23. In *Ryan*, the D.C. Circuit held

that Exemption 5 could be applied to responses to questionnaires sent by the Attorney General to every senator relating to each senator's "procedures for selecting and recommending potential [judicial] nominees." 617 F.2d at 784, 791.

*Ryan* does not control the outcome here for two reasons. First, in *Klamath*, the Supreme Court expressly indicated that *Ryan* likely went too far in applying the consultant corollary to communications with Congress. *See Klamath*, 532 U.S. at 12 n.4. Specifically, the Court made clear that even if the "consultant corollary" were found to be permissible, it could not be extended to entities who were "communicating with the Government in their own interest or on behalf of any person or group whose interests might be affected by the Government action addressed by the consultant." *Id.* at 12. In a footnote, the Court expressly addressed *Ryan* and characterized it as one of two cases that "arguably went beyond" the "typical" situation for expanding Exemption 5 to encompass retained outside consultants, noting that "we would expect a Senator to have strong personal views on the matter" of the judicial nomination process. *Id.* at 12 n.4. This is all the more true here: undoubtedly members of Congress have strong personal views on potential administrative actions that would dovetail with pending or contemplated legislation—whether by bolstering the goals of that legislation or by undermining them. Thus, to the extent *Ryan* even remains good law, there is clear guidance from the Supreme Court that expanding it further to cover routine inter-branch discussions would be improper.

Second, the facts here differ materially from those in *Ryan*. Unlike here, the agency in *Ryan* explicitly solicited advice from each of the 100 senators on a discrete topic—the process used in each senator's office in connection with judicial nominations—on which senators could be expected to have unique expertise. Here, it appears that the agencies and Congress were engaged in a back-and-forth discussion about potential regulatory actions being contemplated by

30

the agencies, consisting primarily of the agencies providing "status updates" to Congress regarding topics of agency, not congressional, expertise. The interactions at issue here do not bear any of the normal indicia of a consultancy relationship, such as a direct solicitation to consult on a specific task to assist agency decisionmaking.

The remaining cases Defendants point to in support of their expansive claims are similarly unavailing. Some of the cases, like *Ryan*, precede and may not survive *Klamath*. Indeed, the D.C. Circuit expressly declined to determine whether *Ryan* and its progeny remain good law in *NIMJ*, 512 F.3d 677. There, the majority opinion noted that "the extent to which either *Ryan* or *Public Citizen* may have extended Exemption 5 beyond its permissible facts" is "an issue we need not and do not decide here," because the facts in *NIMJ* were consistent with the "typical" outside consultant cases. *Id.* at 683–85; *see also id.* at 688–89 (Tatel, J., dissenting) ("The problem with [*Ryan*, *Formaldehyde Institute*, and *Public Citizen*] . . . is that the Supreme Court rejected exactly this type of reasoning [in *Klamath*]."). In light of this express reservation, Defendants' surprising claim that the "D.C. Circuit has reaffirmed the holding and reasoning from *Ryan*" in those subsequent cases, Defs.' Br. at 23, is misleading at best.

And regardless, *Ryan* and the other pre-*Klamath* cases on which Defendants rely are readily distinguished from the facts here. In *Public Citizen v. DOJ*, considering communications with two former presidents regarding the disposal of records under the Presidential Records Act (PRA), the D.C. Circuit found that the former presidents were serving as "outside consultants" to the agencies for purposes of Exemption 5, relying on two circumstances unique to that situation: first, a former president "retains aspects of his former role—most importantly, for current purposes, the authority to assert the executive privilege regarding Presidential communications," and second, "the consultative relationship involved here is not only explicit, but is mandated by

[the PRA]." 111 F.3d 168, 169–70 (D.C. Cir. 1997). The facts of *Formaldehyde Institute v. HHS*,

889 F.2d 1118 (D.C. Cir. 1989), are equally distinguishable: the communications there involved

academic peer reviewers engaged in a collaborative, scholarly enterprise to ensure published

scientific work met rigorous scientific standards. Although the comments were not directly

solicited by the agency, the court emphasized that receipt of peer review comments is an

expected result of submission of a scholarly work for publication, and the receipt and

confidential treatment of such comments were part of an arrangement between the agency and

the publications that reflected a "mutual understanding." *Id.* at 1124. And the peer review

information (1) directly informed the agency's decisionmaking process on publication; (2) was

the result of a congressionally-mandated process; and (3) reflected scientific coordination where

the actors all had a convergent interest in producing the most rigorous scientific work possible.

The post-*Klamath* cases Defendants cite do no more than reiterate the D.C. Circuit's

support for the "typical" application of the consultant corollary to communications with a

consultant who "does not represent an interest of its own, or the interest of any other client, when

it advises the agency that hires it." *Klamath*, 532 U.S. at 10–11. The facts in each of these cases

readily meet the conditions for the application of the consultant corollary in the "typical"

circumstances identified in *Klamath* and discussed above.

For instance, in *NIMJ*, the court found communications between DOD and experts on

military legal affairs discussing the promulgation of new regulations regarding military

commissions were protected under Exemption 5, 512 F.3d at 680, relying on a number of factors

consistent with the "typical" consultant cases, but not present here: First, DOD expressly and

formally "sought the opinions and recommendations" of the experts. *Id.* at 679; *see also id.*

at 686 (the "consultant relationship" was "evidenced by the fact that the agency [sought] out the

individual consultants and affirmatively solicit[ed] their advice in aid of agency business"). Second, DOD had an "understanding [with the experts] that they w[ould] consult and advise on a continuing basis." *Id.* at 679. Third, the experts DOD consulted with "had no individual interests to promote." *Id.* at 683. Thus there were "indicia of a consultant relationship," *id.* at 686, and it was reasonable to view the military experts as part of DOD for purposes of Exemption 5.

Likewise, in *McKinley v. Bd. of Governors of Fed. Reserve Sys.*, 647 F.3d 331, 337 (D.C. Cir. 2011), the D.C. Circuit concluded that communications from the Federal Reserve Bank of New York to the Board of Governors of the Federal Reserve System in connection with the approval of a loan to Bear Stearns were protected under Exemption 5. In reaching this conclusion the D.C. Circuit again relied on factors consistent with the "typical" consultant cases but not present here: First, the FRBNY is an "operating arm" of the Board and did not "'represent an interest of its own, or the interest of any other client, when it advise[d] the [Board]' on the Bear Stearns loan." *Id.* at 337. Second, the interests of FRBNY and the interests of the Board did not "diverge"; rather, the statute requires both to separately determine that the loan "promotes the maintenance of a sound and orderly financial system." *Id.* For these reasons it was reasonable for the court to view FRBNY as part of the Board for purposes of Exemption 5.

Similarly, in *Judicial Watch v. DOE*, 412 F.3d 125, 129–30 (D.C. Cir. 2005), the D.C. Circuit concluded that agencies could withhold communications with an advisory group established by the President to develop national energy policy and staffed entirely by detailed federal employees, notwithstanding that the advisory group was not, itself, an agency. The D.C. Circuit based this conclusion on the simple fact that the deliberations at issue were wholly internal to the executive branch, again a factor not present here: the detailed federal employees were "Executive Branch officials who play important roles in the formulation of policy"

analogous to White House staff, and the fact that those officials were not part of an "agency" did

not preclude application of Exemption 5. *Id.* at 130 ("We are aware of no reason to believe—

indeed, we think it inconceivable—the Congress intended Exemption 5 to protect the

decisionmaking processes of the Executive Branch when the decision is to be made by 'agency'

officials subject to oversight by the President and not when the decision is to be made by the

President himself and those same agency officials are acting in aid of his decision-making

processes."). It was therefore entirely reasonable to view the advisory board staffed by federal

employees as effectively part of the agencies for purposes of the relevant executive branch

deliberations.

Unlike those cases, here the communications reflect the ordinary back-and-forth

interactions one would expect between two co-equal branches regarding the crafting of national

policy. There is no plausible way to view the congressional participants here as part of HHS and

OMB for purposes of Exemption 5. Defendants offer no evidence that they "solicited" "advice"

from the members of Congress and congressional staff regarding agency decisionmaking, nor of

any "understanding" of a consultancy arrangement. The members of Congress and congressional

staff represent different constituencies and have independent and adverse interests. The facts

here do not reflect the "indicia of a consultant relationship" between Defendants and each of

their congressional interlocutors. Because the "nature of the relationship" between the agencies

and Congress was not akin to that of a retained outside contractor to the agency that hired it, the

"consultant corollary" is not applicable.[8]

---

[8] For the same reasons, the persuasive authority of the decision of this court in *Judicial Watch v. DOT*, 950 F. Supp. 2d 213 (D.D.C. 2013), does not support extending Exemption 5 to cover the facts here. In that case, DOT and a state transportation agency entered into a formal contract agreement to develop environmental impact reports for a high-speed rail project. *Id.* at 214. The court concluded that communications between the two entities pursuant to this agreement could

### 3.   *Defendants' Position Rests on a Fundamental Misunderstanding of Our Constitutional Scheme.*

Defendants' contention that their communications here with members of Congress and their staff are "intra-agency" communications for purposes of Exemption 5 because their congressional interlocutors were acting as outside consultants performing roles akin to agency personnel, *see* Defs.' Br. at 22, is fundamentally inconsistent with the respective roles of Congress and the executive branch in our constitutional scheme.

The Constitution establishes Congress and the executive branch as separate and co-equal branches of government, a separation of powers designed to permit each branch to check and balance the other. *See Buckley v. Valeo*, 424 U.S. 1, 124 (1976). By constitutional structure and design, the relationship between Congress and the executive branch is necessarily adversarial. The Constitution sets up a structure with three branches of government to serve as a check on each other because of their distinctive institutional interests, powers, and responsibilities. As the famous quote by James Madison explains in Federalist 51, the Constitution is designed to let "[a]mbition . . . counteract ambition." The Federalist No. 51, at 349 (J. Madison); *see also Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 501 (2010) ("The Framers created a structure in which '[a] dependence on the people' would be the 'primary control on the government.' The Federalist No. 51, at 349 (J. Madison). That dependence is maintained . . . [by] giving each branch 'the necessary constitutional means, and personal motives, to resist encroachments of the others,' *id.*, No. 51, at 349.").

---

be protected under Exemption 5, emphasizing that any distinct interests the state agency may have had were "too remote from its communications with [DOT] and from the decision [DOT] was making." *Id.* at 220. That case therefore falls squarely within the "typical" consultant corollary line of cases.

The vision of executive-legislative relations advanced by Defendants is fundamentally at odds with this constitutional structure. We do not have a parliamentary system where the party in control of the legislature forms the executive ministries. *See Loving v. United States*, 517 U.S. 748, 766 (1996) ("Far from attempting to replicate the English system, . . . the Framers separated the powers of the Federal Government into three branches to avoid dangers they thought latent or inevitable in the parliamentary structure."). The Framers intended a government of "opposite and rival interests," The Federalist No. 51, at 349, and accepted the attendant loss in efficiency of government, recognizing that "in the long term, structural protections against abuse of power were critical to preserving liberty." *Bowsher v. Synar*, 478 U.S. 714, 730 (1986).

Placed in this context, it is clear that the suggestion that members of Congress and congressional staff serve as "outside consultants" to federal agencies on executive decisions acting akin to agency employees, providing confidential advice and recommendations to agency decisionmakers, is fundamentally incompatible with the constitutional scheme established by the Framers. The executive branch and Congress cannot waive the separation of powers out of convenience. Indeed, not only is the notion that Congress is acting "akin to an agency employee" incompatible with the structure and design of the constitutional scheme, it also is, at least in spirit, in tension with the express constitutional prohibition against members of either house of Congress serving as officers of the United States contained in the Incompatibility Clause. *See* U.S. CONST. art. I, § 6, cl. 2 (". . . no Person holding any Office under the United States, shall be a Member of either House during his Continuance in Office."). The Incompatibility Clause reflects the Framers' deep concern with the mixing of executive and legislative decisionmaking.

Ultimately, the fact that members of Congress and federal agencies may, occasionally, share policy goals does not eliminate the inherent conflicts of interest between the two branches,

as each represents different constituencies and has different institutional interests, powers, and responsibilities. These "opposite and rival interests" cannot be reconciled with the consultant corollary's requirement that the outside consultant be acting as a neutral, independent expert, whose "only obligations are to truth and its sense of what good judgment calls for, and in those respects the consultant functions just as an employee would be expected to do." *Klamath*, 532 U.S. at 10–11.

### 4. *Adopting Defendants' Position Would Have Wide-Ranging, Deleterious Consequences at Odds with FOIA's Animating Purpose.*

Agencies routinely gather a broad range of input from a diverse array of interested parties outside the government, ranging from think tanks and advocacy organizations to trade groups and regulated entities, as part of their decisionmaking process. These external interactions by agencies are regularly the subject of FOIA requests seeking information about government operations and accountability regarding the influences shaping agency policymaking. Defendants' expansive view of who can serve as an outside consultant protected from disclosure under FOIA threatens to sweep all agency interactions with outside groups under an Exemption 5 rug. If shared policy goals alone suffice to satisfy the requirement that an outside consultant's advice is sufficiently disinterested, a broad swath of interactions with outside groups or political organizations and parties similarly could be shielded from disclosure under FOIA. Defendants' arguments would sweep in not just Congress but also national political committees, state and local governments, industry and trade groups, public interest organizations, labor unions, even the Sierra Club, the Koch Foundation, and the Chamber of Commerce.

These far-reaching sweeping consequences of Defendants' position conflicts with the animating spirit of FOIA: to promote transparent and accountable government. FOIA starts from the premise that the public has an overwhelming interest in the release of information that

"shed[s] light on an agency's performance of its statutory duties." *DOJ v. Reporters' Comm. for Freedom of the Press*, 489 U.S. 749, 773 (1989). "The basic purpose of [ ] FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The radical expansion of the scope of material potentially protected from disclosure under Exemption 5 that would be effected by implementing Defendants' expansive view of the "consultant corollary" is wholly contrary to this animating purpose. Indeed, at least one judge of this circuit has already concluded that to construe Exemption 5 "to cover *everyone* an agency asks for advice," rather than limiting it to those who plausibly stand in the shoes of agency employees, would "stretch Exemption 5 beyond its breaking point." *NIMJ*, 512 F.3d at 689 (Tatel, J., dissenting) (emphasis in original). This Court should reject Defendants' invitation to expand the "intra-agency requirement" of Exemption 5 to reach these communications.

## B. Defendants Have Not Established that the Material Redacted Under Exemption 5 Is Protected by the Deliberative Process Privilege.

Even if Congress were considered to be acting on behalf of the agencies, such that their communications could constitute "inter-agency or intra-agency" communications under Exemption 5's threshold requirement, Defendants must still establish that the redacted communications are protected by the deliberative process privilege.

The government bears the burden of establishing that the redacted materials were lawfully withheld. *See* 5 U.S.C. § 552(a)(4)(B); *NRDC v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000). In order for the deliberative process privilege to apply, the documents must be (1) pre-decisional, and (2) deliberative. *See Jordan v. DOJ*, 591 F.2d 753, 774 (D.C. Cir. 1978) (*en banc*); *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975). For a

document to be pre-decisional, it must be "actually antecedent to the adoption of an agency policy." *Jordan*, 591 F.2d at 774. To be deliberative, a document must be a "direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn*, 523 F.2d at 1144. "It is not enough to say that a memorandum 'expresses the author's views' on a matter. The role played by the document in the course of the deliberative process must also be established." *Judicial Watch v. Reno*, 154 F. Supp. 2d 17, 18 (D.D.C. 2001) (citations omitted).

Defendants have failed to meet their burden of demonstrating that the communications at issue qualify for protection under the deliberative process privilege, as they have not adequately demonstrated that these emails "make recommendations or express opinions on legal or policy matters," nor have they established the role played by these documents in the course of the agencies' deliberative processes. For example, one frequent *Vaughn* entry used by HHS notes that the withheld material constitutes a discussion of "the potential attendance of former Secretary Price at a planned conference with members of Congress, and the subject matter of the planned conference." Marquis Decl. Ex. 6 (*Vaughn* index for HHS 2017-00722-00079). Nothing about the subject matter of a proposed conference would appear to make a recommendation or express an opinion on a legal or policy matter. *See also id.* (*Vaughn* index for HHS 2017-00722-00102, -103, -104-05, -108-09, -111-12, -113, -114). Another similar entry notes that the redacted material constitutes a discussion of "plans to set up a follow-up meeting with congressional staff about policy issues raised during former Secretary Price's talk at a June 20, 2017 Republican Policy Committee lunch." *See id.* (*Vaughn* index for HHS 2017-00722-00115). It is unclear how plans to set up a meeting could reflect recommendations or express opinions on legal or policy matters. Nor does anything about those descriptions indicate the role played by

those documents in the agency's decisionmaking process. And for many of the redactions, HHS provides only the conclusory assertion that release of the redacted material would "compromise the agency's deliberative process in considering administrative or regulatory options for healthcare reform" and/or would compromise the agency's "strategy for engaging with Congress about administrative or regulatory actions under consideration with respect to healthcare reform." *See id.* (HHS *Vaughn* index). Those assertions do not suffice to meet the agency's burden under FOIA.

For its part, OMB did not even provide a *Vaughn* index for its one Exemption 5 redaction, but simply asserted that the one-line redaction is "deliberative because it reveals details of the process for undertaking [the assessment of possible healthcare regulatory actions] and preliminary options related to the assessment." Walsh Decl. ¶ 20. The "process for undertaking" an assessment of various regulatory actions does not constitute a recommendation or opinion about a legal or policy matter. Indeed, the "process" that *has been established* for evaluating potential regulatory actions, by definition, is neither pre-decisional nor deliberative. So at least part of this redaction should be segregated from any exempt material.

Defendants therefore have not satisfied their burden of establishing that the redacted communications are in fact protected by the deliberative process privilege. At a minimum, in light of the unique circumstances of these records and Defendants' conclusory and self-serving assertions regarding their redactions, as well as the agency's burden, the Court should engage in an *in camera* review of the redacted materials before accepting the Exemption 5 redactions. *See Larson v. Dep't of State*, 565 F.3d 857, 869–70 (D.C. Cir. 2009).

## **CONCLUSION**

For the foregoing reasons, Plaintiff American Oversight respectfully requests that this Court grant its cross-motion for summary judgment, deny Defendants' motion for summary judgment, and require HHS and OMB to promptly release non-exempt materials previously redacted under Exemption 5 or as non-responsive.


Dated: May 7, 2018                                         Respectfully submitted,

                                                           */s/ Sara Kaiser Creighton*
                                                           Sara Kaiser Creighton
                                                           D.C. Bar No. 1002367
                                                           Austin R. Evers
                                                           D.C. Bar No. 1006999
                                                           John E. Bies
                                                           D.C. Bar No. 483730
                                                           AMERICAN OVERSIGHT
                                                           1030 15th Street NW, B255
                                                           Washington, DC 20005
                                                           (202) 869-5245
                                                           sara.creighton@americanoversight.org
                                                           austin.evers@americanoversight.org
                                                           john.bies@americanoversight.org
                                                           *Counsel for Plaintiff*